FILED
United States Court of Appeals
Tenth Circuit

May 5, 2010

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

PJ, a minor, by and through his
parents and natural guardians Barbara
and Daren Jensen; DAREN JENSEN,
individually; BARBARA JENSEN,
individually,

        Plaintiffs - Appellants/
        Cross - Appellees,

    v.

LARS M. WAGNER, in his individual
capacity; KAREN H. ALBRITTON, in
her individual capacity,

        Defendants - Appellees/
        Cross - Appellants,

    and

KARI CUNNINGHAM, in her
individual capacity; RICHARD
ANDERSON, in his individual and
official capacities; SUSAN
EISENMAN, in her individual
capacity,

        Defendants - Appellees.

No. 08-4197, 08-4206

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D. Ct. No. 2:05-CV-00739-TS)**

Karra J. Porter (Roger P. Christensen and Sarah E. Spencer, with her on the briefs), Christensen & Jensen, P.C., Salt Lake City, Utah, appearing for Appellants/Cross-Appellees.

Andrew M. Morse (David G. Williams and R. Scott Young, with him on the briefs), Snow, Christensen & Martineau, Salt Lake City, Utah, appearing for Appellees/Cross-Appellants Wagner and Albritton.

Bridget K. Romano, Assistant Attorney General (Mark L. Shurtleff, Utah Attorney General, with her on the brief), Office of the Attorney General for the State of Utah, Salt Lake City, Utah, appearing for Appellees Cunningham, Anderson, and Eisenman.

Before **TACHA**, **ALARCÓN**,[*] and **TYMKOVICH**, Circuit Judges.

**TACHA**, Circuit Judge.

There is perhaps no more delicate constitutional barrier protecting individual freedom from governmental interference than that which protects against state interference with parental autonomy. The Supreme Court has long recognized that "[t]he child is not the mere creature of the state," *Pierce v. Society of Sisters*, 268 U.S. 510, 535 (1925), and that "the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944). It is also well-

---

[*]Honorable Arthur L. Alarcón, Senior Circuit Judge, United States Court of Appeals for the Ninth Circuit, sitting by designation.

settled, however, that "[a] democratic society rests for its continuance upon the healthy, well-rounded growth of young people into full maturity," and that states "may secure this against impeding restraints and dangers within a broad range of selection." *Id.* at 168. Because of the importance of parental rights and the concomitant interest of the state in the health and safety of minor children within its borders, the intersection of individual freedom and state authority is always difficult to traverse when a child's life is at stake. This case arises at this difficult constitutional intersection and involves both parents and state actors who genuinely sought to do what they believed was best for a child who was tragically stricken with a life-threatening illness. We have jurisdiction under 28 U.S.C. § 1291, and for the reasons discussed below we REVERSE in part and AFFIRM in part the decision of the district court.

## I. BACKGROUND

This 42 U.S.C. § 1983 case was initiated by P.J., a minor child, and his parents Daren and Barbara Jensen.[1] The defendants are five state actors who were involved in the legal dispute in a Utah juvenile court over P.J.'s custody and medical care. Those state actors include: (1) Susan Eisenman, the Assistant Utah Attorney General who prosecuted the juvenile case on behalf of the state; (2) Dr. Karen Albritton, the state's expert medical witness throughout the juvenile court

---

[1] Although P.J. is a named party, the Jensens do not assert any claims on appeal that implicate his independent rights. Accordingly, we only address Mr. and Mrs. Jensen's rights in this appeal.

proceedings; (3) Dr. Lars Wagner, the doctor at Primary Children's Medical Center ("PCMC") who initially diagnosed P.J.'s illness and who referred P.J.'s case to the state; (4) Kari Cunningham, the Utah Division of Child and Family Services ("DCFS") social worker who initiated the custody petition on behalf of the state; and (5) Richard Anderson, the DCFS director who, late in the proceedings, attempted to negotiate a resolution to P.J.'s case.[2]

On April 30, 2003, an oral surgeon removed a small growth from the floor of P.J.'s mouth. After laboratory testing revealed that the growth was malignant, the surgeon referred the Jensens to PCMC where they ultimately met with Dr. Wagner in the hospital's oncology department. On May 20, 2003, Dr. Amy Lowichik completed a pathology report on the growth removed from P.J.'s mouth. Dr. Cheryl Coffin, another pathologist, concurred in the report. The report diagnosed the growth as Ewing's sarcoma, a rare form of cancer, based on a testing procedure known as immunohistochemical staining and on the morphology of the tumor cells. Dr. Wagner discussed the pathology report with Dr. Coffin, who expressed confidence in the diagnosis and explained that no further testing was necessary to confirm it, even though other tests such as cytogenetic or molecular testing were available.

On May 21, 2003, Dr. Wagner met with the Jensens to explain P.J.'s

---

[2]The Jensens named additional defendants in their complaint, but they are no longer parties at this point in the litigation.

diagnosis. During this consultation, Dr. Wagner explained that P.J.'s disease was life threatening and expressed his belief that immediate chemotherapy treatment was necessary to save P.J.'s life. When the Jensens asked if any further tests could be performed to confirm the diagnosis, Dr. Wagner said no. The Jensens requested that Dr. Wagner send P.J.'s tissue sample to the Dana-Farber Cancer Institute at Harvard University for a second opinion. Dr. Wagner complied with this request; however, the Jensens ultimately canceled the Dana-Farber review.

On May 29, 2003, the Jensens returned to PCMC to meet with Dr. Wagner. During this meeting, the Jensens requested that Dr. Wagner perform a Positron Emission Tomography ("PET") scan to confirm the Ewing's diagnosis. Dr. Wagner refused to order the PET scan, explained that such a test would not be useful, and stated that even a negative scan would not change his opinion that P.J. need immediate chemotherapy. The Jensens asked Dr. Wagner again if further testing could be performed to confirm P.J.'s diagnosis, and Dr. Wagner again said no. Additionally, the Jensens asked Dr. Wagner to consider an alternative treatment to chemotherapy called Insulin Potentiation Therapy ("IPT"). Dr. Wagner stated that he was unfamiliar with IPT but that he would examine it as an alternative treatment method. After consulting with other doctors and performing independent research on IPT, Dr. Wagner concluded that there was insufficient data available about the treatment's safety and effectiveness, and it therefore was not a viable treatment option for P.J.

On June 5, 2003, Dr. Wagner reported his conclusions about IPT to the Jensens and reiterated his belief that immediate chemotherapy treatment was necessary to save P.J.'s life. During this communication, Dr. Wagner also informed the Jensens of his legal and ethical duty to report P.J.'s case to DCFS if P.J.'s best medical interests were not being addressed. Because it appeared that Dr. Wagner and the Jensens had reached an impasse regarding the best course of treatment for P.J., a meeting among Dr. Wagner, the Jensens, and other PCMC staff was scheduled for June 9, 2003 at PCMC. During the June 9 meeting, Dr. Wagner again expressed his belief that immediate chemotherapy was necessary to save P.J.'s life, and the head of PCMC's quality assurance department informed the Jensens that it may be necessary to refer P.J.'s case to DCFS. Nevertheless, the Jensens refused to consent to chemotherapy and told the PCMC representatives that they were fired.

On June 16, 2003, Dr. Wagner formally referred P.J.'s case to DCFS. Ms. Cunningham was assigned to the case. Ms. Cunningham believed, based on the information provided to her by Dr. Wagner and another PCMC doctor, that P.J.'s situation presented a medical emergency that had to be addressed immediately. Accordingly, she did not contact the Jensens or perform any investigation; rather, she filed a Verified Petition and Motion to Transfer Custody and Guardianship ("verified petition") in the Utah juvenile court based entirely on the information she received from the doctors. The juvenile court set the first hearing on the

-6-

verified petition for June 20, 2003.

Upon receiving notice of the verified petition, the Jensens obtained an attorney and had more tissue removed from P.J.'s mouth for independent testing. That tissue was sent to a pathologist at the University of Washington, who ultimately diagnosed it as Ewing's sarcoma. Additionally, the Jensens contacted Dr. John Thomson, a radiation oncologist at LDS Hospital in Salt Lake City, Utah, who completed a written report on June 19, 2003, confirming the original diagnosis. The report stated, "It is my opinion that [P.J.] has a Stage 1 or Group 1 nonosseous Ewing sarcoma with a favorable prognosis when treated to the standard of care with poly chemotherapy . . . [and I] doubt that further pathologic evaluation would alter recommended therapy. . . ."

On June 20, 2003, the Jensens made their first appearance in the juvenile court. At the initial hearing, the Jensens explained to the court that they were seeking further tests. In addition, the Jensens and the state indicated that it might be possible to reach a stipulation regarding P.J.'s treatment. Accordingly, the juvenile court continued the hearing until July 10, 2003.

Around the time of the initial hearing, the Jensens contacted Dr. Jeorg Birkmayer, who practiced in Vienna, Austria. Dr. Birkmayer indicated that he was not "totally convinced" that P.J. had Ewing's sarcoma and suggested that he was not sure that chemotherapy was necessary. When Ms. Eisenman learned of the Jensens' contact with Dr. Birkmayer and their desire to have him supervise

P.J.'s treatment, she sent Dr. Birkmayer an e-mail in which she inquired about his qualifications and whether Austria had a similar standard of care to that in the United States. According to the Jensens, they ultimately abandoned their plan to retain Dr. Birkmayer because DCFS insisted that P.J.'s medical care be provided by a board-certified pediatric oncologist, which Dr. Birkmayer apparently was not.

At the July 10, 2003 hearing, the juvenile court sustained an objection made by the Jensens' attorney which prevented DCFS from presenting evidence supporting its verified petition because the hearing had been set for a pre-trial conference and not an evidentiary hearing. The Jensens questioned whether P.J. actually had Ewing's sarcoma, but a stipulation was reached under which the Jensens would have P.J. examined at the Children's Hospital of Los Angeles ("CHLA") and would abide by that hospital's treatment recommendations. Based on this stipulation, the juvenile court again continued the case until July 28, 2003.

On July 21, 2003, the Jensens met with Dr. David Tishler at CHLA. During the consultation, Dr. Tishler informed the Jensens that he would wait to give his final recommendation until independent CHLA tests had been performed but that he was initially recommending chemotherapy treatment based on the tests that had already been completed. The Jensens were dissatisfied with Dr. Tishler's recommendation and, in violation of their stipulated agreement, they never returned to CHLA. Instead, the Jensens sought care from Dr. Charles Simone, a

New Jersey doctor who ultimately refused to be involved in P.J.'s case because he did not want to become embroiled in a legal battle.

At the July 28, 2003 hearing, the juvenile court received testimony from Dr. Tishler. He stated that CHLA testing was not yet complete but that there was no question P.J. had a malignant tumor which required immediate chemotherapy. Dr. Tishler also testified that the specific tests being performed by CHLA would only serve to clarify the specific type of chemotherapy that would be best for P.J. The Jensens' attorney argued that not all testing had been completed and advocated for the Jensens' desire to conduct additional tests. The Jensens also expressed their preference that Dr. Simone serve as P.J.'s primary physician. DCFS's expert medical witness, Dr. Albritton, however, explained to the juvenile court that Dr. Simone should not be P.J.'s primary physician because he was not a board-certified pediatric oncologist. Dr. Tishler agreed and testified that "[t]here's no other physician that could lead the care and provide the care."

Based on Dr. Albritton's and Dr. Tishler's testimony, the juvenile court ordered that P.J. begin receiving chemotherapy treatment by August 8, 2003, regardless of the results of the CHLA testing. Furthermore, the juvenile court ordered that P.J.'s primary physician be a board-certified pediatric oncologist but that Dr. Simone could work with P.J. in conjunction with his other approved doctors. Finally, the juvenile court ordered an evidentiary hearing on the verified petition for August 20, 2003, in the event that P.J.'s case was not yet resolved by

then.

On August 7, 2003, one day before P.J. was ordered to commence chemotherapy treatment, the Jensens obtained an appointment to meet with doctors at the Burzynski Clinic in Houston, Texas, on August 12. On August 8, the Jensens violated the juvenile court's order by taking P.J. out of Utah to a friend's lake house in Idaho rather than beginning the court-ordered chemotherapy treatment. When Ms. Eisenman did not receive confirmation that P.J. had commenced chemotherapy treatment, she sought an immediate hearing with the juvenile court for the purpose of obtaining authorization to take P.J. into protective custody. Ms. Eisenman, Ms. Cunningham, Dr. Albritton, P.J.'s guardian ad litem, and the Jensens' attorney participated in that hearing, which took place on August 8. At the hearing, the Jensens' attorney informed the juvenile court that P.J. was not receiving chemotherapy treatment, that the Jensens did not want P.J. to receive chemotherapy treatment, and that the Jensens were going to have P.J. evaluated at the Burzynski Clinic. Dr. Albritton indicated that the Burzynski Clinic was not a suitable facility for P.J. because: Dr. Burzynski was not a board-certified pediatric oncologist; Dr. Albritton was not aware of any board-certified pediatric oncologists on staff at the Burzynski Clinic; and the Burzynski Clinic was not an appropriate treatment facility for newly-diagnosed cancer patients who had not exhausted standard treatment options.

At the conclusion of the hearing, Ms. Eisenman filed an application to take P.J. into protective custody that was supported by affidavits from Dr. Wagner and Ms. Cunningham. The juvenile court ordered the custody transfer, and Ms. Eisenman contacted the Sandy City Police Department to execute the warrant. The Sandy City Police were unable to serve the warrant, however, because the Jensens had already left the state. When the Jensens' attorney informed them that the juvenile court had ordered that P.J. be taken into state custody to begin chemotherapy treatment, the Jensens ignored the order and allegedly decided to continue with their plans to have P.J. evaluated at the Burzynski Clinic on August 12.

On August 13, 2003, P.J.'s guardian ad litem filed a motion for an order to show cause in the juvenile court which ultimately resulted in that court's issuance of a bench warrant for the Jensens' arrest and an order requiring the Jensens to appear and present P.J. Ms. Eisenman informed the Jensens' attorney and P.J.'s guardian ad litem that if the Jensens did not comply with the order she would contact local and federal law enforcement authorities. On August 15, 2003, the Salt Lake County District Attorney's Office agreed to screen P.J.'s case at Ms. Eisenman's request and ultimately filed criminal charges of misdemeanor custodial interference and felony kidnaping against both Mr. and Mrs. Jensen.

Although the Jensens claim they left Utah on August 7 only to have a brief family vacation before taking P.J. to the Burzynski Clinic on August 12, the

Jensens and P.J. were at Mrs. Jensen's parents' Idaho home on August 16, 2003, and had not yet been to the Burzynski Clinic. On that day, Mrs. Jensen allowed P.J. to drive the family car down her parents' long driveway to retrieve the mail. P.J. wrecked the vehicle, and neighbors who saw the accident called the police. Mrs. Jensen then fled her parents' home with P.J. in an effort to hide him from the authorities. When police arrived, Mr. Jensen falsely reported that P.J.'s brother had been driving the vehicle when the accident occurred. When officers realized there was a warrant for his arrest, they took Mr. Jensen into custody and he was released on bail four days later. Meanwhile, Mrs. Jensen attempted to take P.J. to the Burzynski Clinic in Houston, but she was turned away because of the Utah custody order.

On August 20, 2003, the juvenile court held a hearing at which the Jensens' attorney read a letter by Mr. Jensen and explained the Jensens' desire to present evidence. The juvenile court set an evidentiary hearing, but refused to lift the warrants it had issued for the Jensens' arrest. Shortly after the August 20 hearing, Ms. Eisenman assumed a new position in the Utah Attorney General's Office and did not further participate in P.J.'s case. Around this time, Mr. Anderson was asked by a representative from the Utah governor's office to attempt to negotiate a resolution with the Jensens. Accordingly, Mr. Anderson traveled to Idaho on August 27, 2003, where he met with the Jensens for several days.

On September 5, 2003, the parties entered into a stipulated agreement under

which the Jensens would submit P.J. to the care of Dr. Martin Johnston, a board-certified pediatric oncologist in Boise, Idaho. The Jensens further agreed that they would abide by Dr. Johnston's treatment recommendations, even if he recommended chemotherapy. Based on these assurances, the juvenile court approved the stipulated agreement and returned full custody of P.J. to the Jensens.

After evaluating P.J., Dr. Johnston informed the Jensens of his diagnosis and recommended treatment. In a letter to the Jensens, Dr. Johnston stated, "There has never been any question but that the tumor is a high-grade sarcoma, most compatible with a Ewing's sarcoma. After full review, I have arrived at the same conclusion." Dr. Johnston's letter also recommended chemotherapy treatment. In violation of the September 5 stipulation, however, the Jensens refused to submit P.J. to chemotherapy treatment and claimed that Dr. Johnston was merely rubber-stamping previous doctors' diagnoses. Additionally, Mr. Jensen threatened Dr. Johnston, stating that if P.J. ever received chemotherapy treatment at Dr. Johnston's hospital, "I'm going to make sure it's a hellish experience for everybody involved. I'm going to shut down this clinic, I'm going to shut down this hospital, and I'm going to fight you tooth and nail the whole way."

On October 2, 2003, the Jensens entered into a plea agreement which resolved their criminal charges. Under the agreement, the Jensens pleaded guilty to the misdemeanor custodial interference charge in exchange for the state's

promise to drop the felony kidnaping charge. The state dropped the felony charge and the Utah district court accepted the Jensens' guilty plea in abeyance on the misdemeanor charge.

On October 8, 2003, Dr. Johnston informed the juvenile court that he had diagnosed P.J. with Ewing's sarcoma, that he had recommended chemotherapy treatment, and that the Jensens had refused to commence his recommended treatment. Assistant Attorney General Mark May, who had taken the case over from Ms. Eisenman, informed the juvenile court that the parties would attempt to reach a settlement. Then, on October 22, 2003, DCFS filed a motion to dismiss the verified petition. In its motion, DCFS indicated that although it was confident that without chemotherapy treatment P.J.'s chance of survival would fall dramatically, the state had concluded that forcing P.J. to undergo chemotherapy treatment had become unworkable because of the Jensens' refusal to obtain such treatment under any circumstances. Furthermore, DCFS indicated that the state's interest in the case had shifted such that attempting to force chemotherapy treatment and placing the Jensens in jail would no longer be in P.J.'s best interest and indeed may "impede [his] medical treatment." Accordingly, the juvenile court dismissed P.J.'s case and terminated its jurisdiction over the matter.

In July 2005, the Jensens filed this § 1983 civil suit for damages in state court against eight state actors involved in P.J.'s case. After the case was removed to federal court and several defendants were dismissed, the Jensens'

-14-

present claims against the five current defendants remained. The Jensens alleged that each of the five defendants remaining in this case violated their: (1) substantive due process right to direct P.J.'s medical care; (2) substantive due process right to familial association; (3) procedural due process rights; and (4) Fourth Amendment right to be free from unreasonable seizure based on the alleged malicious prosecution of the Jensens. All five defendants filed motions for summary judgment based on claims of absolute or qualified immunity, and Dr. Albritton and Dr. Wagner argued that the entire case should be dismissed for lack of jurisdiction pursuant to the *Rooker-Feldman* doctrine. *See Rooker v. Fid. Trust Co.*, 263 U.S. 413 (1923); *D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983). The district court rejected the doctors' *Rooker-Feldman* argument, concluded that Ms. Eisenman and Dr. Albritton were absolutely immune from suit, concluded that the Jensens failed to overcome the remaining defendants' claims of qualified immunity, and ultimately granted all five defendants' motions for summary judgment. The Jensens appeal from the district court's summary judgment order, and Dr. Albritton and Dr. Wagner cross-appeal from the district court's denial of summary judgment based on their jurisdictional argument.

## II. DISCUSSION

We review de novo the district court's decision to grant each defendant summary judgment, viewing the facts in the light most favorable to the non-moving party. *Turner v. Public Serv. Co. of Colo.*, 563 F.3d 1136, 1142 (10th

-15-

Cir. 2009). Summary judgment is appropriate when the record demonstrates "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). Once the movant shows the absence of a genuine issue of material fact, the non-moving party "must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which he or she carries the burden of proof." *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). This requires the non-moving party to present sufficient facts that a reasonable jury could find in his or her favor. *Id.*

A.      Jurisdictional Issues—The *Rooker-Feldman* Doctrine

Because it implicates our subject matter jurisdiction, we address the cross-appellants' claim that the *Rooker-Feldman* doctrine bars this entire § 1983 suit before turning to the merits of the case. *See Crutchfield v. Countrywide Home Loans*, 389 F.3d 1144, 1147 (10th Cir. 2004) (addressing *Rooker-Feldman* argument before considering the merits and explaining that the issue is integral to subject matter jurisdiction). Generally, the *Rooker-Feldman* doctrine precludes lower federal courts "from effectively exercising appellate jurisdiction over claims actually decided by a state court and claims inextricably intertwined with a prior state-court judgment." *Mo's Express, LLC v. Sopkin*, 441 F.3d 1229, 1233 (10th Cir. 2006) (quotations omitted). The Supreme Court recently clarified the narrow scope of the *Rooker-Feldman* doctrine, stating that it is "confined to cases of the kind from which the doctrine acquired its name: cases brought by state-

-16-

court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).

In light of *Exxon*, we have concluded that "the type of judicial action barred by *Rooker-Feldman* [] consists of a review of the proceedings already conducted by the 'lower' tribunal to determine whether it reached its result in accordance with law." *Bolden v. City of Topeka*, 441 F.3d 1129, 1143 (10th Cir. 2006). In this way, we have explained that "*Rooker-Feldman* does not bar federal-court claims that would be identical even had there been no state-court judgment; that is, claims that do not rest on any allegation concerning the state-court proceedings or judgment." *Id.* at 1145.

Additionally, our recent *Rooker-Feldman* jurisprudence has emphasized the relief sought by federal-court plaintiffs. *See Mo's Express, LLC*, 441 F.3d at 1237 ("[W]e approach the [*Rooker-Feldman*] question by asking whether the state-court judgment *caused*, actually and proximately, the *injury* for which the federal-court plaintiff seeks *redress*."). In *Mo's Express, LLC*, we concluded that federal-court plaintiffs who only sought prospective injunctive and declaratory relief were not barred by the *Rooker-Feldman* doctrine because "their federal suit would not reverse or otherwise 'undo' the relief granted by the [state court] . . . ." *Id.* at 1238. Conversely, we recently held that a federal-court plaintiff's claims

-17-

seeking monetary damages from government actors who complied with probate court orders unfavorable to the plaintiff were barred by the *Rooker-Feldman* doctrine because success on the claims "would require the district court to review and reject [the probate court's] judgments." *Mann v. Boatright*, 477 F.3d 1140, 1147 (10th Cir. 2007).

Given this framework, we first identify the two state-court judgments adverse to the Jensens that neither the federal district court nor this court may review or undo in any way: (1) the juvenile court's August 8 order granting the state custody over P.J.; and (2) the state district court's October 2 order accepting the Jensens' guilty pleas for misdemeanor custodial interference. The district court concluded that none of the Jensens' claims are barred by the *Rooker-Feldman* doctrine because the "constitutional injury alleged by the Jensens is separate and independent from any orders of the state courts . . . ."

On appeal, the Jensens base their substantive and procedural due process claims on misrepresentations allegedly made by the defendants during the juvenile court proceedings and with respect to P.J.'s medical treatment, and on DCFS's alleged failure to conduct an independent investigation of P.J.'s case before filing the verified petition. Without addressing every underlying factual allegation against each defendant here, we agree with the district court that each of these claims "seek[s] relief independent from any judgment rendered by the state courts." Although the alleged misrepresentations and failure to investigate

-18-

are closely connected to the juvenile court proceedings and the Jensens' criminal prosecution, they are sufficiently extricable from any state-court judgment for *Rooker-Feldman* purposes. Indeed, the Jensens' substantive and procedural due process claims would be identical even if there were no state-court orders adverse to the Jensens. Therefore, these claims do not allege "injuries caused by state-court judgments," *Exxon*, 544 U.S. at 284, and thus are not barred by the *Rooker-Feldman* doctrine.

Conversely, the Jensens' malicious prosecution claims necessarily invite federal-court undoing of the two adverse state-court orders. To succeed on their § 1983 malicious prosecution claims, the Jensens must prove: (1) the defendants caused their continued confinement or prosecution; (2) some original action terminated in favor of the Jensens; (3) no probable cause supported the Jensens' original arrest, continued confinement, or prosecution; (4) the defendants acted with malice; and (5) the Jensens sustained damages. *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008). Accordingly, to satisfy the third element of their malicious prosecution claims, the Jensens must convince a lower federal court that there was no probable cause for the prosecution of either the juvenile court proceedings or the criminal proceedings. As discussed above, however, those state-court proceedings resulted in adverse judgments for the Jensens. Therefore, a lower federal court would necessarily have to review and reject those judgments in order for the Jensens to succeed on their malicious prosecution claims.

-19-

Furthermore, "[t]he Fourth Amendment in the context of a malicious prosecution claim deals with *judicial determinations* of probable cause . . . ." *Id.* at 802. And, the Jensens may only show the existence of a Fourth Amendment violation if they can show that the legal process itself was wrongful. *Id.* at 798. We fail to see how a federal court could conclude that the juvenile proceedings or the Jensens' criminal prosecution themselves were wrongful without reviewing and, in essence, reversing the adverse state-court judgments that were the products of those proceedings. Therefore, the *Rooker-Feldman* doctrine bars the Jensens' malicious prosecution claims.

B.      Absolute Immunity—Ms. Eisenman and Dr. Albritton

Next, we address the Jensens' claim that the district court erred by granting Ms. Eisenman and Dr. Albritton absolute immunity from this § 1983 suit.[3] We review de novo a district court's conclusion that a defendant is entitled to absolute immunity. *Scott v. Hern*, 216 F.3d 897, 908 (10th Cir. 2000). "'[A]bsolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity.'" *Spielman v. Hildebrand*, 873 F.2d 1377, 1381 (10th Cir. 1989) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 419 n.13

[3]The district court also granted Ms. Cunningham absolute prosecutorial immunity for her decision to file the verified petition in juvenile court, but denied her absolute immunity for her other actions in this case. On appeal, the Jensens do not object to this conclusion and Ms. Cunningham does not seek broader absolute immunity protection than what the district court granted her. Accordingly, we do not address the propriety of the district court's decision in this regard.

-20-

(1976)). Under our functional approach to claims of absolute immunity, we examine whether the particular actions of the defendant are within the scope of the claimed immunity, not whether the status of the defendant or the office that she holds entitles her to protection. *See, e.g.*, *Perez v. Ellington*, 421 F.3d 1128, 1133 (10th Cir. 2005).

1. *Ms. Eisenman*

"State attorneys . . . who perform functions analogous to those of a prosecutor in initiating and pursuing civil and administrative enforcement proceedings are absolutely immune from suit under section 1983 concerning activities intimately associated with the judicial process." *Scott*, 216 F.3d at 908 (internal quotations omitted). Such government actors are not immune, however, for actions "that are primarily investigative or administrative in nature." *Pfeiffer v. Hartford Fire Ins. Co.*, 929 F.2d 1484, 1490 (10th Cir. 1991). To distinguish between actions that are intimately associated with the judicial process and those that are investigative or administrative in nature, we look to whether the actions can rightly be considered advocacy "because that is the prosecutor's main function and the one most akin to his quasi-judicial role." *Id.* Furthermore, "absolute immunity may attach even to . . . administrative or investigative activities 'when these functions are necessary so that a prosecutor may fulfill his function as an officer of the court.'" *Id.* (quoting *Snell v. Tunnell*, 920 F.2d 673, 693 (10th Cir. 1990)).

-21-

The Jensens base their claims against Ms. Eisenman on: (1) misrepresentations she allegedly made to the juvenile court; (2) her research regarding the American Academy of Pediatrics's guidelines for clinicians who render pediatric care and her resistance to the Jensens' attempt to have P.J. treated by doctors who were not qualified under those guidelines; and (3) misrepresentations she allegedly made to the Salt Lake County District Attorney. The undisputed evidence demonstrates that any statements Ms. Eisenman made to the juvenile court were made in her role as an advocate for the state's interest in the custody dispute. Likewise, any research Ms. Eisenman performed regarding the appropriate type of doctor for P.J. and any actions she took to ensure that P.J. was treated by an appropriately credentialed doctor were intimately associated with the judicial process and Ms. Eisenman's role as an advocate for the state. Therefore, those actions are clearly within the scope of Ms. Eisenman's claimed absolute immunity.

The protection afforded Ms. Eisenman's statements to the Salt Lake County District Attorney, however, is less clear. The Jensens argue that by making misrepresentations to the Salt Lake County District Attorney which eventually led to their criminal prosecution, Ms. Eisenman was acting as a complaining witness rather than as a prosecutor. Furthermore, the Jensens correctly point out that a complaining witness is not entitled to absolute immunity. *See Malley v. Briggs*, 475 U.S. 335, 340–41 (1986). Under the circumstances of this case, however, we

-22-

agree with the district court that Ms. Eisenman's presentation of facts to the Salt Lake County District Attorney was intimately associated with the juvenile court process and was done in Ms. Eisenman's role as an advocate for the state. The day Ms. Eisenman met with the Salt Lake County District Attorney, the juvenile court had ordered the Jensens to present P.J. to the court for the purpose of beginning chemotherapy treatment. The Jensens were aware of this juvenile court order and had, in fact, stated their intention not to comply with it. Furthermore, the Jensens admit they were attempting to hide P.J. from state authorities in order to prevent the effectuation of the juvenile court order. Under these circumstances, Ms. Eisenman's presentation of evidence to the Salt Lake County District Attorney was necessary to effectuate the juvenile court's order and to pursue the interest of the state in ensuring that P.J. receive treatment for his life-threatening illness. Accordingly, these actions were necessary to fulfill both her roles as officer of the court and advocate for the state, and are therefore protected by absolute immunity.

2. *Dr. Albritton*

Like the absolute immunity afforded prosecutors who perform actions intimately associated with the judicial process, "[t]he immunity of parties and witnesses from subsequent damages liability for their testimony in judicial proceedings is well established in the common law. . . ." *Spielman*, 873 F.2d at 1382. Testifying witness immunity is "supported by the public policy of

-23-

preserving the truthfinding process from distortions caused by fear of suit." *Id.* The Jensens' claims against Dr. Albritton center on her testimony before the juvenile court; the Jensens allege that her testimony contained various misrepresentations and "had more the flavor of someone working to perpetuate proceedings (*i.e.*, a complaining witness), than merely providing objective information." This contention reflects a fundamental misunderstanding of the well-established immunity for testifying witnesses. A witness is absolutely immune from civil liability based on any testimony the witness provides during a judicial proceeding "even if the witness knew the statements were false and made them with malice." *Briscoe v. LaHue*, 460 U.S. 325, 332 (1983). Thus, even if Dr. Albritton's testimony was aimed at perpetuating the custody proceedings against the Jensens, she is protected by absolute immunity. Accordingly, Dr. Albritton is absolutely immune from any claims against her in this § 1983 suit.

C.    Qualified Immunity—Dr. Wagner, Ms. Cunningham, and Mr. Anderson

Finally, we address the Jensens' constitutional claims against Dr. Wagner, Ms. Cunningham, and Mr. Anderson, who have all claimed a defense of qualified immunity. "When a defendant pleads qualified immunity, the plaintiff has the heavy burden of establishing: (1) that the defendant's actions violated a federal constitutional or statutory right; and (2) that the right violated was clearly established at the time of the defendant's actions." *Scott*, 216 F.3d at 910 (quotations omitted). Federal courts may "exercise their sound discretion in

-24-

deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, – U.S. –, 129 S. Ct. 808, 818 (2009).

The "clearly established" prong of the qualified immunity analysis ensures that governmental actors are given fair warning that their conduct is unconstitutional before they are held liable for damages based on that conduct. *Harman v. Pollock*, 586 F.3d 1254, 1260 (10th Cir. 2009). A right is clearly established "when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as [the] plaintiff maintains." *Id.* at 1261. That does not mean that we must have previously decided a case that is materially factually similar or identical to the present case; instead, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

1.    *The Jensens' Substantive Due Process Right to Direct P.J.'s Medical Care*

The district court concluded that the Jensens failed to show that any defendant violated their right to direct P.J.'s medical care. Because the district court decided this issue under the first prong of the qualified immunity analysis, it did not have occasion to consider whether the Jensens' right to direct P.J.'s medical care in the circumstances presented in this case was clearly established at

-25-

the time of the alleged violations. Furthermore, on appeal, the Jensens confine their argument to the first prong of the qualified immunity analysis and assume that under the circumstances of this case their right to direct P.J.'s medical care is clearly established. We reject this assumption and conclude that the Jensens' right to direct P.J.'s medical care in this case—if any right indeed exists in such circumstances—was not clearly established at the time the Jensens allege the right was violated.

We begin by acknowledging that the Due Process Clause generally provides constitutional protection for parental rights. Indeed, the Supreme Court has stated that "the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000). Furthermore, although we have never specifically recognized or defined the scope of a parent's right to direct her child's medical care, *see Roska v. Peterson*, 328 F.3d 1230, 1247 n.14 (10th Cir. 2003) ("We express no opinion on whether such a right [to direct a child's medical care] might exist within the context of general familial rights."), we do not doubt that a parent's general right to make decisions concerning the care of her child includes, to some extent, a more specific right to make decisions about the child's medical care. *See Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1203 (10th Cir. 2003) ("It is not implausible to think that rights invoked here—the right to refuse a medical exam and the parent's right to control

the upbringing, including the medical care, of a child—fall within [the Due Process Clause's] sphere of protected liberty.").

The Supreme Court has similarly alluded to, but never specifically defined the scope of a parent's right to direct her child's medical care. Indeed, the Court has recognized that "[m]ost children, even in adolescence, simply are not able to make sound judgments concerning . . . their need for medical care or treatment," *Parham v. J.R.*, 442 U.S. 584, 603 (1979), and that our legal system presumes "that natural bonds of affection lead parents to act in the best interests of their children." *Id.* at 602. Therefore, this precedent reasonably suggests that the Due Process Clause provides some level of protection for parents' decisions regarding their children's medical care.

The Supreme Court has long recognized, however, that parental rights, including any right to direct a child's medical care, are not absolute. *See Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("[N]either rights of religion nor rights of parenthood are beyond limitation."); *see also Parham*, 442 U.S. at 604 ("[P]arents cannot always have absolute and unreviewable discretion to decide whether to [seek specific medical care for their children]," but they "retain plenary authority to seek such care for their children, subject to a physician's independent examination and medical judgment."). Indeed, states have a compelling interest in and a solemn duty to protect the lives and health of the children within their borders. *See, e.g.*, *Globe Newspaper Co. v. Superior Court*

*for Norfolk County*, 457 U.S. 596, 607 (1982) ("[S]afeguarding the physical and psychological well-being of a minor . . . is a compelling [interest].").

Accordingly, when a child's life or health is endangered by her parents' decisions, in some circumstances a state may intervene without violating the parents' constitutional rights. *See Parham*, 442 U.S. at 603 ("[W]e have recognized that a state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized.").

Under this constitutional framework, we conclude that the Jensens' asserted right to direct P.J.'s medical care in this case is not clearly established. The record demonstrates that no less than seven qualified and competent doctors evaluated P.J., diagnosed him with life-threatening cancer, and recommended that he immediately undergo chemotherapy treatment in order to save his life. In this particular situation, the Jensens did not have a clearly established constitutional right to refuse the unanimous recommended treatment or to solicit additional opinions until they found a doctor who disagreed that conventional treatment was necessary. Indeed, the Jensens had a "'high duty' to recognize symptoms of illness and to seek and follow medical advice." *Id.* at 602.

Furthermore, when a child's life is under immediate threat, a state's interest in protecting the child is at its zenith, and a state has broad authority to intervene in parental decisionmaking that produces the threat to the child's life. *See Prince*,

321 U.S. at 167 ("[T]he state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare."). Here, the state was endowed with this broad authority, and the Jensens do not direct us to a clearly established constitutional line that defines what a state can and cannot do to protect a child whose life is compromised by his parents' refusal to obtain medical care. Certainly, the Jensens do not assert any factual allegation that is substantially supported in the record which would constitute state action that is clearly outside the state's "wide range of power." Accordingly, under the circumstances of this case, the Jensens' asserted right to direct P.J.'s medical care was not clearly established at the time of the alleged violations; therefore, they cannot overcome the defendants' claims of qualified immunity.

2.    *The Jensens' Substantive Due Process Right to Familial Association*

In contrast to the Jensens' purported right to direct P.J.'s medical care in this case, we resolve their claims regarding their substantive due process right to familial association and their procedural due process rights on the first prong of the qualified immunity inquiry—namely, that the Jensens have not shown a violation of their constitutional rights.

More than twenty-five years ago the Supreme Court recognized that "[f]amily relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also

-29-

distinctively personal aspects of one's life." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 619–620 (1984). Shortly thereafter, this court first recognized the existence of a right to familial association within the substantive rights protected by the Due Process Clause. *See Griffin v. Strong*, 983 F.2d 1544, 1546–47 (10th Cir. 1993) (discussing the development of the right of familial association in the Tenth Circuit). In numerous decisions since the right was first recognized, we have applied a balancing test to determine whether the plaintiff's right to familial association has been infringed. *See, e.g.*, *id.* at 1547–49; *J.B. v. Washington County*, 127 F.3d 919, 927 (10th Cir. 1997); *Lowery v. County of Riley*, 522 F.3d 1086, 1092 (10th Cir. 2008). Under this test, "we balance 'the individual's interest in liberty against the State's asserted reasons for restraining individual liberty.'" *Lowery*, 522 F.3d at 1092 (quoting *Youngberg v. Romeo*, 457 U.S. 307, 320 (1982)). The purpose of the balancing test is to ascertain whether a defendant's conduct constitutes an undue burden on the plaintiff's associational rights. *Griffin*, 983 F.2d at 1547.

Because the Jensens' opening brief fails to articulate a particularized factual allegation that any defendant violated their associational rights, we address their general claims under the balancing test discussed above. First, the Jensens' interest in associating with P.J. is unquestionably of paramount importance. *See id.* at 1548 ("The right to associate with one's family is a very substantial right."); *see also U.S. Jaycees*, 468 U.S. at 618 ("[F]reedom of

association receives protection as a fundamental element of personal liberty."). Second, as discussed above, the state's interest in protecting and safeguarding P.J.'s life is also significant. Finally, given these countervailing interests, the record demonstrates that the actual burden on the Jensens' right to associate with P.J. was minimal in this case. The Jensens correctly point out that "the forced separation of parent from child, even for a short time, represents a serious impingement." *J.B.*, 127 F.3d at 925 (alteration omitted). In this case, however, P.J. was never physically removed from the Jensens' custody and the state afforded the Jensens numerous opportunities to obtain treatment for P.J. before it even sought to remove him from their custody. Under these circumstances, the Jensens fail to show that any defendant imposed an undue burden on their relationship with P.J. and therefore fail to show a violation of their associational rights.

### 3. The Jensens' Procedural Due Process Rights

"[P]rocedural due process does not prevent the state from depriving an individual of liberty or property. It only requires that a fair procedure be provided for the deprivation." *Doyle v. Okla. Bar Ass'n*, 998 F.2d 1559, 1569 (10th Cir. 1993). As a threshold matter, a plaintiff must show that he possesses a constitutionally cognizable liberty or property interest before he can allege an unconstitutional deprivation of that interest. *Id*. To be constitutionally cognizable, "the interest must rise to more than an abstract need or desire and

-31-

must be based on more than a unilateral hope." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (internal quotations and citations omitted). Indeed, to satisfy the threshold requirement, a plaintiff must demonstrate a legitimate claim of entitlement to the asserted interest which may arise either from the Due Process Clause itself or state law. *Id.*

"'A state creates a protected liberty interest by placing substantive limitations on official discretion.'" *Doyle*, 998 F.2d at 1569 (quoting *Olim v. Wakinekona*, 461 U.S. 238, 249 (1983)) (alteration omitted). State law, however, does not generally create a constitutionally cognizable liberty interest simply "by establishing substantive predicates to govern official decision-making"; rather, the state must also "mandat[e] the outcome to be reached upon a finding that the relevant criteria have been met." *Thompson*, 490 U.S. at 462 (quotations and citations omitted). If state law establishes a substantive predicate without mandating an outcome, the law creates nothing more than a right to process which is not a constitutionally cognizable liberty interest. *See Doyle*, 998 F.2d at 1570 ("The mere expectation of receiving a state afforded process does not itself create an independent liberty interest protected by the Due Process Clause.").

Once a procedural due process plaintiff establishes a constitutionally cognizable liberty or property interest of which she has been deprived by the state, we "examine[] whether the procedures attendant upon that deprivation were constitutionally sufficient." *Thompson*, 490 U.S. at 460. Although the exact

-32-

procedures required by the Constitution depend on the circumstances of a given case, "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotations omitted).

The Jensens allege procedural due process claims only against Dr. Wagner and Ms. Cunningham.[4]  They base their claim against Dr. Wagner on misrepresentations he allegedly made to the juvenile court and to others involved with the custody dispute.  The Jensens appear to argue that these misrepresentations infected the juvenile proceedings to the point that they did not afford the Jensens the opportunity to be heard "in a meaningful manner." Although we can conceive of circumstances in which false testimony may infect a judicial proceeding to the point that the proceeding itself becomes constitutionally deficient, *c.f. United States v. Vaziri*, 164 F.3d 556, 563 (10th Cir. 1999) (concluding that a criminal conviction obtained by perjured testimony violates due process under certain circumstances), the Jensens have not demonstrated that any statements by Dr. Wagner had such a degenerative effect on the juvenile court proceedings in this case.  Accordingly, the Jensens have not met their burden of showing that Dr. Wagner violated their procedural due process rights.

---

[4]The Jensens cursorily allege that all defendants made misrepresentations that violated their procedural due process rights; however, they make no specific factual allegations against Mr. Anderson.  Accordingly, we do not read the Jensens' opening brief as asserting a procedural due process claim against Mr. Anderson.

The Jensens base their procedural due process claim against Ms. Cunningham on her failure to independently investigate the medical neglect allegations made by Dr. Wagner before filing the verified petition in the juvenile court. Specifically, the Jensens argue that Utah statutes required Ms. Cunningham to interview the Jensens and obtain an independent medical examination of P.J. before filing the verified petition. Thus, the Jensens claim a constitutionally cognizable liberty interest in an independent investigation by DCFS. As discussed above, however, a right to process under state law is not itself a liberty interest protected by the Due Process Clause; rather, state law must also mandate a specific outcome upon a finding that certain criteria are met. *Doyle*, 998 F.2d at 1570. The Jensens do not point to any Utah statutes that mandate a specific outcome upon completion of the required DCFS investigation and a finding that certain criteria are met during that investigation. Accordingly, the Jensens fail to establish any constitutionally cognizable liberty interest and thus fail to meet the threshold requirement for a procedural due process claim against Ms. Cunningham.

### III.  CONCLUSION

Because parental autonomy is fundamental to our democracy and culture and a state's interest in protecting the health and safety of minor children is compelling, state actors who are responsible for intervening in parental relationships must always make difficult decisions that may have constitutional

-34-

implications. Accordingly, such state actors operate on one of the most delicate constitutional barriers in our legal system and their good faith actions to protect children must also be protected by our laws. In this case, the Jensens fail to show that any defendant violated their clearly established constitutional rights. Moreover, we conclude that we lack jurisdiction under the *Rooker-Feldman* doctrine to consider their claim premised on malicious prosecution. Therefore, for the foregoing reasons, the decision of the district court is REVERSED in part and AFFIRMED in part. The defendants' requests for attorneys fees and costs are denied.