**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 3, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

JANE DOE; I.B.,

    Plaintiffs - Appellants,

v.

APRIL WOODARD, in her individual capacity; CHRISTINA NEWBILL, in her individual capacity; SHIRLEY RHODUS, in her individual capacity; RICHARD BENGTSSON, in his individual capacity; EL PASO COUNTY BOARD OF COUNTY COMMISSIONERS,

    Defendants - Appellees,

and

REGGIE BICHA, in his official capacity as Executive Director of the Colorado Department of Human Services; JULIE KROW, in her official capacity as Executive Director of the El Paso County Department of Human Services,

    Defendants.
_____

PARENTAL RIGHTS FOUNDATION; NATIONAL CENTER FOR HOUSING AND CHILD WELFARE; NATIONAL COALITION FOR CHILD PROTECTION REFORM; PARENT GUIDANCE CENTER; MARK FREEMAN; PACIFIC JUSTICE INSTITUTE,

    Amici Curiae.

No. 18-1066

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:15-CV-01165-KLM)**

Theresa Lynn Sidebotham, (Jessica Ross with her on the brief), of Telios Law PLLC, Monument, Colorado, for Plaintiffs - Appellants.

Kenneth R. Hodges, Senior Assistant County Attorney (Diana K. May, First Assistant County Attorney, with him on the brief), Colorado Springs, Colorado, for Defendants - Appellees.

Kevin T. Snider, Pacific Justice Institute, Sacramento, California, filed an Amicus Curiae brief for Pacific Justice, in support of Appellants.

Darren A. Jones and James R. Mason, III, Purcellville, Virginia, Martin Guggenheim and Carolyn Kubitschek, Alexandria, Virginia, Diane Redleaf, College Park, Maryland, and Mark Freeman, Media, Pennsylvania, filed an Amici Curiae brief for Parental Rights Foundation, National Center for Housing and Child Welfare, National Coalition for Child Protection Reform, Parent Guidance Center, and Mark Freeman, Esq., in support of Appellants.

Before **BRISCOE**, **LUCERO**, and **MATHESON**, Circuit Judges.

**MATHESON**, Circuit Judge.

I.B., a minor child, and her mother, Jane Doe (collectively, "Does"), claim that April Woodard, a caseworker from the El Paso County Department of Human Services ("DHS"), a state agency, wrongfully searched I.B. at the Head Start preschool program in Colorado Springs. Without consent or a warrant, Ms. Woodard partially undressed

2

I.B., performed a visual examination for signs of abuse, then photographed I.B.'s private areas and partially unclothed body.

In their lawsuit, the Does alleged that Ms. Woodard and other DHS officials violated the Fourth Amendment's prohibition on unreasonable searches and the Fourteenth Amendment's protection against undue interference with parental rights and with familial association. The Defendants moved to dismiss.[1] The district court granted the motion, holding that qualified immunity precludes the Fourth Amendment unlawful search claim and that the complaint failed to state a Fourteenth Amendment claim.

The Does appeal these rulings and the district court's denial of leave to amend their complaint. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. BACKGROUND

### A. *Factual Background*

In reviewing the grant of a motion to dismiss, we accept the allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party— here, the Does. *Mayfield v. Bethards*, 826 F.3d 1252, 1255, 1258 (10th Cir. 2016).

---

[1] The Does sued six defendants, who are identified in the procedural history section below.

In December 2014, I.B. was attending preschool at the Head Start Program in Colorado Springs.[2] An anonymous source reported to DHS possible signs of abuse on I.B.'s body, including bumps on her face, a nickel-sized bruise on her neck, a small red mark on her lower back, two small cuts on her stomach, and bruised knees. DHS caseworker April Woodard responded to the report, arriving to take I.B. to the nurse's office.[3] Allegedly acting on instructions from DHS supervisor Christina Newbill, Ms. Woodard removed I.B.'s clothing and visually inspected and photographed I.B.'s buttocks, stomach, and back using a county-issued cell phone.[4]

The Does alleged that the undressing and photographing were "executed under an unwritten, but well-established county-wide policy or custom encouraging the practice, often without first obtaining parental consent or a court order." Aplt. Br. at 5 (citing Aplt.

---

[2] Pacific Justice's amicus brief explains that Head Start is "a federally funded preschool in which children engage in a course of age-appropriate studies conducted by a teacher. Although not a K-12 public school, Head Start primarily functions as an educational institution for very young children." Pacific Justice Amicus Br. at 2 (footnote omitted). The "program meets on public school campuses." *Id.*

[3] This was the not DHS's first investigation regarding I.B. The Does alleged that, between 2012 and 2014, DHS investigated their home "around half a dozen times, based on false reports that I.B. was being abused." Am. Compl. ¶ 15. One investigation was based on a report that I.B. had marks resembling a hand print on her bottom and lower-back bruising. DHS visually examined I.B. with her clothing removed. DHS closed the investigation, finding in January 2014 the report was unfounded. *Id.* ¶¶ 24-32.

[4] According to Defendants, "the school's health paraprofessional" assisted Ms. Woodard. Aplee. Br. at 7.

4

App., Vol. I at 21-28). They further alleged that Richard Bengtsson, then Executive Director of the El Paso County DHS, issued the policy, and the director of Ms. Woodard's department, Shirley Rhodus, implemented it.

The following day, Ms. Woodard visited Ms. Doe at home. DHS did not suspect her of abuse, and she cooperated with the investigation. Ms. Woodard did not inform Ms. Doe that she had inspected and photographed I.B. in a state of partial undress. The case was closed as unfounded.

After DHS closed the case, I.B. told her mother about the incident, saying she hoped she would not see Ms. Woodard again because "I don't like it when she takes all my clothes off." Aplt. App., Vol. I at 17. I.B. later said to Ms. Doe that Ms. Woodard had taken photos of her against her will. Aplt. App., Vol. I at 18. When Ms. Doe approached Ms. Woodard about her daughter's accusations, Ms. Woodard at first denied them. Two months later, she reversed course and admitted that she did the inspection and took photographs. Ms. Woodard told Ms. Doe that a child abuse accusation and investigation takes priority over the mother's parental rights.

B. *Procedural History*

The Does sued under 42 U.S.C. § 1983, alleging violation of I.B.'s Fourth Amendment rights and violations of I.B.'s and Ms. Doe's Fourteenth Amendment

5

rights.[5] The Fourth Amendment claims were based on both the visual inspection and the photographs; the Fourteenth Amendment claims only on the inspection. In addition to Ms. Woodard, the Does named as defendants Ms. Woodard's supervisors, Ms. Newbill and Ms. Rhodus; Mr. Bengtsson, Executive Director of El Paso County DHS; Reggie Bicha, Executive Director of Colorado DHS; and the El Paso Board of County Commissioners ("BOCC"). The Does sought damages and prospective relief against a "statewide and local policy and custom" encouraging "strip searching children whenever injuries are alleged." Aplt. App., Vol. I at 40. The Defendants moved to dismiss based on qualified immunity and failure to state a claim.

1. **Dismissal of Fourth Amendment Claims**

A magistrate judge[6] concluded Ms. Woodard and her supervisors were entitled to qualified immunity on the Fourth Amendment claim[7] and dismissed the claim without prejudice. When the Does sought to file an amended complaint, the court rejected the request on futility grounds and dismissed the claim with prejudice.

---

[5] Because I.B. is a minor, Ms. Doe brought her claims for her. Although we refer to "the Does" when discussing the Fourth and Fourteenth Amendment claims, the Fourth Amendment claims are solely on behalf of I.B.

[6] The parties agreed to have all proceedings in the case decided by a magistrate judge. *See* 28 U.S.C. § 636(c). We will refer to the magistrate judge's court as the "district court."

[7] *Doe et al. v. Woodard et al.*, No. 1:15-CV-01165-KLM (D. Colo. Sept. 30, 2016).

6

a. *Ms. Woodard and Ms. Newbill*

The district court dismissed the Fourth Amendment claim against Ms. Woodard and Ms. Newbill because the law was not so "clearly established" as to "give Defendants fair warning that the taking photographs of portions of I.B.'s unclothed body required a warrant." Dist. Court Op. at 16.

To the extent the Fourth Amendment claim was based on the Defendants' failure to show that the "special needs" doctrine justified the search, the district court recognized that a special needs search comports with the Fourth Amendment only if it is "justified at its inception" and "reasonably related in scope to the circumstances which justified interference in the first place." *Id.* at 19 (quotations omitted). But, the district court concluded, the Does' complaint "lack[ed] allegations" the search was unjustified at its inception or was improper in scope. *Id.*[8]

The district court dismissed the Does' Fourth Amendment claim without prejudice.

b. *Ms. Rhodus and Mr. Bengtsson*

The district court dismissed the Fourth Amendment § 1983 supervisory liability claim against Ms. Rhodus and Mr. Bengtsson. Because qualified immunity shielded their supervisees, Ms. Woodard and Ms. Newbill, it also shielded them. *Id.* at 22. The

---

[8] The district court also said Defendants' conduct was objectively reasonable because they complied with a Colorado statute authorizing photography in cases of suspected child abuse. *Id.* (citing Colo. Rev. Stat. § 19-3-306).

7

court also dismissed the claim for prospective relief against Ms. Rhodus and Mr. Bengtsson, which demanded safeguards on storing photographs obtained in future searches, because it was based only on a "mere potential violation." *Id.* at 23-24.

2. **Dismissal of Fourteenth Amendment Claims**

    a. *Ms. Woodard and Ms. Newbill*

The district court dismissed, for failure to state a claim, the Does' substantive due process claims under the Fourteenth Amendment for violation of the parental right to direct medical care and of the right to familial association.

        i. <u>Right to direct medical care</u>

The district court dismissed the parental rights claim, stating that (1) the visual exam of a child was not "essentially a medical procedure"; (2) the complaint did not allege that the exam "affected [I.B's mother's] right to direct [I.B.'s] medical care"; and (3) the complaint did not allege that the exam caused any "interference with [I.B.'s] medical treatment." *Id.* at 31 (quotations omitted).

        ii. <u>Right to familial association</u>

The district court dismissed the familial association claims, concluding the Does did not sufficiently plead that (1) the Defendants intended to separate I.B. from her mother or that (2) the Defendants knew their conduct would adversely affect the familial relationship. *Id.*

    b. *Ms. Rhodus*, *Mr. Bengtsson*, *and Mr. Bicha*

8

The district court also dismissed the Fourteenth Amendment supervisory claims against Ms. Rhodus and Mr. Bengtsson and the official capacity claims against Mr. Bengtsson and Mr. Bicha because the complaint failed to allege an underlying violation of the Fourteenth Amendment.[9]

## 3. Denial of Leave to Amend and Dismissal with Prejudice

When the Does attempted to amend their complaint, the district court denied the request, stating that the Does "have not addressed the Court's determination that Defendants were entitled to qualified immunity because the law was not clearly established with respect to whether Defendants needed a warrant in order to search the minor Plaintiff.  In the absence of any case clearly establishing Plaintiffs' rights as asserted, the Court cannot find that Defendants knowingly violated the law, even assuming that they committed a constitutional violation."  Aplt. App., Vol. II at 72-73 (citations and quotations omitted).[10]

---

[9] The Does do not appeal the dismissal of the Fourteenth Amendment official-capacity claims.

[10] The Does sued the BOCC for its role in the same alleged violations under the Fourth and Fourteenth Amendments.  The district court dismissed these claims because the BOCC is a county rather than state entity and lacked final policymaking control. This ruling is not on appeal.

The district court also dismissed the Fourth and Fourteenth amendment claims with prejudice.[11]

---

[11] The claim for prospective relief against Mr. Bengtsson and Mr. Bicha in their official capacities survived the motion to dismiss. Limited discovery was granted regarding standing on the claim, but it was later dismissed by stipulation of the parties. No prospective claim against Ms. Rhodus and Mr. Bengtsson in their official capacity is part of this appeal.

## II. DISCUSSION

Our discussion reviews (A) the district court's qualified immunity dismissal of the Does' Fourth Amendment claims and (B) its dismissal of their Fourteenth Amendment claims for failure to state a claim. We affirm in both instances.

### A. *Fourth Amendment Claims*

This section provides background on the standard of review; qualified immunity law; Fourth Amendment search requirements, with emphasis on the special needs doctrine; and analysis of whether the Does have shown there was clearly established law at the time of the search to support their claim. We conclude they have not shown clearly established law that the special needs doctrine could not support the search in this case. They therefore have not shown that a warrant clearly was required.[12]

### 1. Standard of Review

We review de novo the grant of a motion to dismiss under Rule 12(b)(6) due to qualified immunity. *Estate of Lockett v. Fallin*, 841 F.3d 1098, 1106 (10th Cir. 2016).

---

[12] This approach is similar to the one we followed in *McInerney v. King*, 791 F.3d 1224 (10th Cir. 2015). In that case, the plaintiff brought a § 1983 action alleging a Fourth Amendment violation based on the defendant police officer's warrantless search of her home. We reversed the district court's grant of qualified immunity. As in our case, the search was conducted without a warrant, and the defendant relied on an exception to the warrant requirement to contest the Fourth Amendment claim. After reviewing the existing case law, we concluded it was clearly established that the exigent circumstances exception did not apply and therefore the defendant was not entitled to qualified immunity. *Id.* at 1228. Here, after reviewing existing case law, the opinion concludes that the law was *not* clearly established that the special needs exception did not apply, and therefore the defendants were entitled to qualified immunity.

11

"At [the motion to dismiss] stage, it is the defendant's conduct as alleged in the complaint that is scrutinized for 'objective legal reasonableness.'" *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996).

2. **Legal Background**

a. *Qualified immunity*

Under 42 U.S.C. § 1983, a person acting under color of state law who "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ." "Individual defendants named in a § 1983 action may raise a defense of qualified immunity, which shields public officials from damages actions unless their conduct was unreasonable in light of clearly established law." *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014) (citation, ellipsis, and quotations omitted).

"[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). A motion to dismiss based on qualified immunity imposes the burden on the plaintiff to show "both that [1] a constitutional violation occurred and [2] that the constitutional right was clearly established at the time of the alleged violation." *Green v. Post*, 574 F.3d 1294, 1300 (10th Cir. 2009) (quotations omitted). A court evaluating qualified immunity is free to "exercise [its]

12

sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

A constitutional right is clearly established if it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix*, 136 S. Ct. at 308 (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). The plaintiff must show there is a "Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Klen v. City of Loveland*, 661 F.3d 498, 511 (10th Cir. 2011) (quotations omitted). Generally, "existing precedent must have placed the statutory or constitutional question beyond debate" for a right to be clearly established. *The Estate of Lockett*, 841 F.3d at 1107 (quoting *Mullenix*, 136 S. Ct. at 308).

There "need not be a case precisely on point." *Redmond v. Crowther*, 882 F.3d 927, 935 (10th Cir. 2018). But "it is a 'longstanding principle that clearly established law should not be defined at a high level of generality.'" *Id.* (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam)); *see also District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) ("The clearly established standard . . . requires a high degree of specificity." (quotations omitted)). "[T]he salient question . . . is whether the state of the law . . . gave [the defendants] fair warning that their alleged treatment of [the plaintiffs] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

13

"[G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers, but in the light of pre-existing law the unlawfulness must be apparent." *White*, 137 S. Ct. at 552 (citations and quotations omitted). "[T]here can be the rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Wesby*, 138 S. Ct. at 590 (quotations omitted).

For supervisory liability, "[p]ersonal participation is an essential allegation in a 1983 claim." *Bennett v. Passic*, 545 F.2d 1260, 1262-63 (10th Cir. 1976). A supervisor cannot be held vicariously liable for the constitutional violations of subordinates. *See Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2003) ("Supervisors are only liable under § 1983 for their own culpable involvement in the violation of a person's constitutional rights.") "[D]irect participation," however, "is not necessary." *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990) (quotations omitted). "The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights." *Id*. (quotations omitted). "[T]he establishment or utilization of an unconstitutional policy or custom can serve as the supervisor's affirmative link to the constitutional violation . . . . Where an official with policymaking authority creates, actively endorses, or implements a policy which is constitutionally infirm, that official may face personal liability for the violations

14

which result from the policy's application." *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010) (quotations and brackets omitted). Supervisors cannot be liable under § 1983 where there is no underlying violation of a constitutional right by a supervisee. *See Martinez v. Beggs*, 563 F.3d 1082, 1092 (10th Cir. 2009).

b. *Fourth Amendment search requirements*

i. <u>The warrant requirement</u>

The Fourth Amendment protects people from unreasonable government searches of their "persons, houses, papers, and effects." U.S. Const. Amend. IV. It "protects the right of the people to be 'secure in their persons' from government intrusion whether the threat to privacy arises from a policeman or a Head Start administrator." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1205 (10th Cir. 2003). "There is no 'social worker' exception to the Fourth Amendment." *Id.*

As a general rule, a search requires a warrant based on probable cause. *Illinois v. Gates*, 462 U.S. 213, 239 (1983). "Searches conducted without a warrant are per se unreasonable under the Fourth Amendment—subject only to a few 'specifically established and well-delineated exceptions.'" *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1248 (10th Cir. 2003) (quoting *Katz v. United States*, 389 U.S. 347, 357

15

(1967)).  These exceptions include (1) consent;[13] (2) exigent circumstances;[14] and (3) a "special need."  In this case, there was no warrant, consent, or exigent circumstance.  The qualified immunity question concerns, therefore, (1) whether a warrant was required for the search because the special needs exception did not apply, and (2) if it did, whether the search nonetheless violated the special needs doctrine.

    ii.  <u>Special needs doctrine</u>

"'Special needs' is the label attached to certain cases where 'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'"  *Dubbs*, 336 F.3d at 1212 (quoting *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cty. v. Earls*, 536 U.S. 822, 830 (2002)).

There is no definitive list of "special needs."  The Supreme Court has found a special need in a principal's in-school search of a student's purse for drugs; a public

---

[13] "It is . . . well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

[14] "The exigent circumstances exception allows a warrantless search when an emergency leaves police insufficient time to seek a warrant.  It permits, for instance, the warrantless entry of private property when there is a need to provide urgent aid to those inside, when police are in hot pursuit of a fleeing suspect, and when police fear the imminent destruction of evidence."  *Birchfield v. North Dakota*, 136 S. Ct. 2160, 2173 (2016) (citation omitted).  "Warrants are generally required to search a person's home or his person unless the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment."  *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (quotations omitted) (brackets omitted).

employer's search of an employee's desk; a probation officer's search of a probationer's home; a Federal Railroad Administration policy requiring employees to take blood and urine tests following a major rail accident; drug testing of United States Customs employees applying for drug interdiction jobs; schools' random drug testing of athletes; and drug testing of public school students partaking in extracurricular activities. *See Dubbs*, 336 F.3d at 1213 (collecting cases). In *Dubbs*, we synthesized the special needs doctrine as follows:

> (1) an exercise of governmental authority distinct from that of mere law enforcement—such as the authority as employer, the in loco parentis authority of school officials, or the post-incarceration authority of probation officers; (2) lack of individualized suspicion of wrongdoing, and concomitant lack of individualized stigma based on such suspicion; and (3) an interest in preventing future harm, generally involving the health or safety of the person being searched or of other persons directly touched by that person's conduct, rather than of deterrence or punishment for past wrongdoing.

*Id.* at 1213-14.

State actors can invoke the special needs doctrine only when the purpose of the search is sufficiently "divorced from the State's general interest in law enforcement." *Ferguson v. City of Charleston*, 532 U.S. 67, 79 (2001) (drug tests used in a state obstetrics ward not justified under special needs because they were coordinated with the police).

17

When it applies, the special needs doctrine employs a more relaxed test than the one traditionally used under the Fourth Amendment to assess the reasonableness of a search. To evaluate special needs reasonableness, we have (1) required that (a) the search be "justified at its inception" and (b) reasonable in its "scope" given the "circumstances";[15] or we have (2) balanced government and private interests.[16]

### 1) Child abuse context: Supreme Court and Tenth Circuit

The Supreme Court has not addressed the special needs doctrine in the context of social workers' inspection of children upon suspicion of child abuse. It has rejected the special needs doctrine to justify a search, but in a different child abuse context. In *Ferguson v. City of Charleston*, 532 U.S. 67 (2001), the Court held that a hospital's testing of pregnant mothers in its maternity ward for cocaine and reporting results to authorities under a theory that a positive result constituted "child abuse" did not qualify for the special needs exception to the Fourth Amendment warrant requirement because of the program's "pervasive involvement of law enforcement." *Id.* at 70, 85.

---

[15] *See, e.g.*, *Edwards For and in Behalf of Edwards v. Rees*, 883 F.2d 882, 884 (10th Cir. 1989) (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985)). *T.L.O.*, in turn, cites this test from *Terry v. Ohio*, 392 U.S. 1, 20 (1968).

[16] *See, e.g.*, *Dubbs*: "[I]n special needs cases, the Court replaces the warrant and probable cause requirement with a balancing test that looks to the nature of the privacy interest, the character of the intrusion, and the nature and immediacy of the government's interest." 336 F.3d at 1213.

The Tenth Circuit has not previously addressed whether the special needs doctrine applies to a social worker's search of a student at school to detect evidence of suspected abuse. We applied it in a child abuse context when a student at a public school needed to be interviewed. *Doe v. Bagan*, 41 F.3d 571, 574 n.3 (10th Cir. 1994). That case concerned a seizure, however, not a search, because it involved the questioning of a minor suspected of abusing another child, not an inspection of the allegedly abused child. *See id.* In another case, we held that special needs did not permit a social worker, who suspected abuse, to enter a home and remove a child. *Roska*, 328 F.3d at 1242. In *Franz v. Lytle*, 997 F.2d 784 (10th Cir. 1993), we held that even if a police officer is performing the functions of a social worker in examining a young child's private areas upon suspicion of abuse, the police officer nevertheless must abide by the Fourth Amendment's warrant requirement.[17]

In *Dubbs v. Head Start, Inc.*, 336 F.3d 1194 (10th Cir. 2003), a school invoked the special needs doctrine when it subjected an entire class of children to intrusive physical examinations (including genital examinations and blood tests) without parental notice or consent, stating this was "done in order to comply with federal regulations [and] is an effective means of identifying physical and developmental

---

[17] We decided *Franz* before the Supreme Court held in *Ferguson* that social workers are not categorically exempt from the warrant requirement when performing a search. *Ferguson*, 532 U.S. at 76 & n.9.

19

impediments in children prior to them starting school, a goal of Head Start." *Id.* at 1214. We did not decide whether the doctrine applied, holding instead that even if it did, the searches were unconstitutional under the balancing test. The extreme privacy deprivations involved in the invasive testing outweighed the ostensible special need of doing a health assessment. *Id.* at 1214-15.

We therefore have not established whether the special needs doctrine permits a social worker to search a child, such as by removing clothing and/or taking photographs, to investigate a report of suspected abuse.

### 2) Child abuse context: other circuits and special needs

Other circuits have split on whether a social worker's examination of a child upon suspicion of abuse requires a warrant or qualifies for the special needs doctrine.

The Seventh Circuit held that a social worker's visual inspection of a child upon suspicion of child abuse falls under the special needs doctrine and thus can proceed without a warrant, as long as the search passes the special needs balancing test and is fundamentally reasonable. *Darryl H. v. Coler*, 801 F.2d 893 (7th Cir. 1986).[18] In *Wildauer v. Frederick County*, 993 F.2d 369 (4th Cir. 1993), the Fourth Circuit held social workers' warrantless examinations of potentially abused children in their foster

---

[18] The Seventh Circuit later limited this holding to searches on public as opposed to private property. *Michael C. v. Gresbach*, 526 F.3d 1008, 1016 (7th Cir. 2008).

homes should be evaluated under a special needs balancing and general "reasonableness" analysis, as opposed to probable cause.

Four other circuits, however, have held that social worker examinations of children based on abuse suspicions are not candidates for special needs analysis. The Third Circuit, in *Good v. Dauphin Cty. Soc. Servs. for Children & Youth*, 891 F.2d 1087 (3d Cir. 1989), held that social workers' search of a child in his home required either a search warrant, consent, or exigent circumstances. The Ninth Circuit, in *Calabretta v. Floyd*, 189 F.3d 808 (9th Cir. 1999), held that a social worker performing a search on a child to investigate possible abuse must have a warrant, consent, or exigent circumstances, and may not rely on the special needs doctrine (especially in this case where a police officer was also present with the social worker). The Second Circuit, in *Tenenbaum v. Williams*, 193 F.3d 581 (2d Cir. 1999), held that judicial authorization was required for social workers to examine a student upon suspicion of abuse. Finally, the Fifth Circuit, in *Roe v. Texas Dep't of Protective & Regulatory Servs.*, 299 F.3d 395 (5th Cir. 2002), held that social workers performing a visual body cavity search for suspected abuse needed a court order based on probable cause or exigent circumstances, and that they could not rely on the special needs doctrine. *Roe* emphasized, under *Ferguson*, the overlap of social workers with law enforcement investigating abuse militates against the applicability of the special needs doctrine. *Id.* at 406.

21

## 3. Analysis

We limit our qualified immunity analysis, as the district court did, to whether the Does can satisfy the second prong of qualified immunity—that is, whether they can show that any Fourth Amendment violation was based on clearly established law.

Defendants do not contest that Ms. Woodard conducted a search for Fourth Amendment purposes.[19] For the search to have been valid under the Fourth Amendment, Ms. Woodard needed a warrant or one of the exceptions to the warrant requirement to apply—consent, exigent circumstances, or the special needs doctrine. Because (1) Ms. Woodard did not obtain a warrant, (2) Ms. Doe did not consent to the search, and (3) the circumstances were not exigent, the search would have been valid without a warrant only if the special needs doctrine applied.

The Does have not cited a Supreme Court or Tenth Circuit decision specifically holding that a social worker must obtain a warrant to search a child at school for evidence of reported abuse. Instead, they argue that (a) only a warrant could have justified the search of I.B. because the special needs doctrine did not apply, or (b) even if the special needs doctrine did apply, Defendants' conduct violated the Fourth Amendment

---

[19] Although the Defendants do not expressly and directly concede that I.B. was subject to a search, they devote their brief to evaluating a "search" of this type. *See, e.g.,* Aplee Br. at 14 ("This Court should consider a social worker's visual inspection and photographing of a child, under the circumstances alleged, as an administrative search subject to the reasonableness balancing test . . . .").

reasonableness standards for a special needs search. The Does have not met their burden of showing clearly established law on either ground.

a. *No showing of clearly established Fourth Amendment law on whether social worker searches examining for abuse qualified for the special needs exception*

In this section, we examine the Does' attempts to show that Ms. Woodard's search violated clearly established Fourth Amendment law in December 2014 because she lacked a warrant and the special needs exception did not apply. They have failed to do so. Based on our previous review of the case law and discussion below, we conclude that neither the Supreme Court nor this court had previously decided that the special needs exception does not apply to warrantless social worker searches for suspected child abuse. Nor was the weight of authority from other circuits clearly established. We therefore hold that, when the search occurred in this case, there was no clearly established law that a warrant was required.

i. Supreme Court and Tenth Circuit law

The Does argue that Supreme Court and Tenth Circuit precedent on special needs existing when Ms. Woodard searched I.B. may be read to find a Fourth Amendment violation under clearly-established law. They cite (1) *Franz*, which held that a police officer could not search a young child without a warrant or consent upon suspicion of abuse; (2) *Dubbs*, which held that examinations of children at school needed a warrant, consent, or exigent circumstances, and that there is no general social

23

worker exception to the Fourth Amendment; (3) *Roska*, for the proposition that the special needs doctrine can be used only when obtaining a warrant is impracticable; and (4) *Ferguson*, for the principle that "[e]xcessive entanglement with law enforcement renders the special need exception inapplicable," Aplt. Br. at 35.[20]

The Does contend that these cases put the DHS caseworkers and their supervisors on notice that Ms. Woodard could not undress and photograph I.B. without a warrant, consent, or exigent circumstances. We disagree that these cases would have put a reasonable social worker on notice that her conduct violated the Fourth Amendment.

First, *Franz* involved a police officer who searched a young child upon suspicion of abuse, and held that the officer needed a warrant, consent, or exigent circumstances to do so. In other words, the special needs doctrine did not apply. But a police search is not a social worker search, and *Franz* does not address the latter.

Second, *Dubbs* does not clearly establish Fourth Amendment law for a social worker's search for child abuse in this case. In *Dubbs*, the school indiscriminately tested the entire class and performed much more invasive examinations. The defendant school officials argued that the special need was for generalized health assessment to

---

[20] In their reply brief, the Does drop their reference to *Ferguson* in their clearly-established argument and rely only on *Franz*, *Dubbs*, and *Roska*. *See* Aplt. Reply Br. at 9.

comply with federal regulations, not to search for child abuse. Accordingly, *Dubbs* did not address the issue presented here—whether Ms. Woodard's search of I.B. for child abuse satisfied the Fourth Amendment as a special needs search.

Third, *Roska* also does not provide clearly established law. In *Roska*, we said that a special need must "make the warrant and probable-cause requirement impracticable." 328 F.3d at 1241 (quotations omitted). It held that, barring exigent circumstances, no special need "renders the warrant requirement impracticable when social workers *enter a home* to remove a child." *Id*. at 1242. *Roska* does not bear upon social workers searching and photographing a child at school for suspected child abuse.

Finally, in *Ferguson*, the Supreme Court held that hospital workers' reporting of drug tests taken in a maternity ward to police could not qualify for the special needs exception because their conduct was too intertwined with law enforcement. *Ferguson* says nothing about social workers searching and photographing a child at school because of suspected child abuse or whether such conduct is unacceptably entangled with law enforcement to qualify for special needs analysis. Nor have we, in contrast to the Fifth Circuit in *Roe*, ever held that a social worker search for suspected abuse context was too closely tied to law enforcement to qualify for the special needs doctrine.

Taken together, these four cases do not constitute clearly established law that the Does suffered a Fourth Amendment violation because no warrant was obtained. They

25

are not factually similar enough to apply to the Does' claim. *See White*, 137 S. Ct. at 552 ("[I]t is again necessary to reiterate the longstanding principle that "clearly established law should not be defined at a high level of generality . . . . [C]learly established law must be particularized to the facts of the case.") (quotations and citations omitted).

ii. Other circuits

Four circuits have rejected the special needs doctrine as an exception to the warrant requirement and two have approved it for searches like the one here. This does not amount to a "clearly established weight of authority from other courts," *Estate of Lockett*, 841 F.3d at 1112 (quotations omitted), such that this "statutory or constitutional question [is] beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Also, the circuits rejecting the special needs doctrine often did so based on facts distinguishable from this case—for instance, the search occurred at the child's home, *see, e.g.*, *Good*, 891 F.2d at 1092; *Roe*, 299 F.3d at 411-12, or involved taking the child out of school to a hospital, *see Tenenbaum*, 193 F.3d at 602.

b. No showing of clearly established law on minimal Fourth Amendment reasonableness standards

Despite the lack of law clearly showing the special needs doctrine did not apply to the search here, the Does could still attempt to show that Ms. Woodard's search failed to meet clearly established minimal Fourth Amendment reasonableness standards applicable to special needs searches.

26

When the Supreme Court first described the "special needs" exception in *New Jersey v. T.L.O.*, 469 U.S. 325 (1985), it said a special needs search must satisfy minimum standards drawn from *Terry v. Ohio*, 392 U.S. 1 (1968):

> the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search. Determining the reasonableness of any search involves a twofold inquiry: first, one must consider "whether the . . . action was justified at its inception"; second, one must determine whether the search as actually conducted "was reasonably related in scope to the circumstances which justified the interference in the first place."

*T.L.O.*, 469 U.S. at 341 (alteration in original) (citation omitted) (quoting *Terry*, 392 U.S. at 20). As noted above, we also have measured reasonableness by balancing government and private interests. *See Dubbs*, 336 F.3d at 1214.[21]

    i. <u>Appellants' failure to show clearly established law</u>

---

[21] Although the *Terry* reasonableness determination and the interest-balancing approach are not identical, courts have recognized overlap in these tests. *See, e.g.*, *Jones v. Hunt*, 410 F.3d 1221, 1228-29 (10th Cir. 2005) (assessing reasonableness under *Terry* and quoting *Wyoming v. Houghton*, 526 U.S. 295, 299–300 (1999), for the proposition that courts may "evaluate the search or seizure under traditional standards of reasonableness by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests."). *See also Darryl H.*, 801 F.2d 902-03 (adopting approach that blends *Terry* analysis with interest-balancing test: "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.") (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)).

The Appellants offer almost no analysis to support their contention that the search violated clearly established minimal Fourth Amendment standards. Their opening brief devotes less than two pages to this issue. Although it cites several cases, including *Dubbs*, it does not provide any case analysis or otherwise begin to show how Appellants can meet the clearly established law burden to overcome qualified immunity. Aplt. Br. at 36-37. Their Reply Brief fares no better. It mixes arguments and case cites about warrant requirements and the special needs exception with arguments about reasonable searches. Aplt. Reply at 8-9. Other than parenthetical case summaries, however, the Reply lacks case analysis or explanation as to why these cases clearly establish that Ms. Woodard's search violated minimal Fourth Amendment protections. The Reply complains that the Appellees have failed to provide case law to support the search and then states it is "not impermissibly shift[ing] the burden" to the Appellees. *Id.* at 10. But that is exactly what their argument would do. The Appellants' failure to meet their burden should resolve the issue. The dissent attempts to do their work for them, but it does not show the law was clearly established, either.

28

ii. <u>The dissent</u>

We have shown that in December 2014 the law did not clearly establish that a warrant was required to justify Ms. Woodard's search. This is so because the law did not clearly establish that Ms. Woodard could not rely on the special needs exception to justify the search. *See McInerney*, 791 F.3d at 1237 (performing clearly established analysis by examining whether it was clearly established that an exception did not apply to the Fourth Amendment's warrant requirement).

Despite appearing to agree with the foregoing, the dissent contends the search violated clearly established Fourth Amendment requirements even assuming the special needs doctrine applied. We disagree for two related reasons—(1) the cases it relies on are factually distinguishable from this case, and (2) Supreme Court precedent calls for factually similar cases to constitute clearly established law. We respond to the dissent to address whether it was clearly established that the special needs doctrine's reasonableness standards were not met in this case.

<u>First</u>, the Does must "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *White*, 137 S. Ct. at 552. The dissent relies on two cases that are materially different from this case. In *Dubbs*, the purpose of the search was to identify physical and developmental impediments in all

29

children to comply with federal Head Start program requirements.[22] The state actors did not attempt to justify the search in *Dubbs* based on the special need of detecting child abuse—just the opposite: "The nurses who administered the examinations, Strayhorn and Baker, testified that the exams were in conformity with standards for well-child examinations and were not performed for the purpose of detecting child abuse." 336 F.3d at 1200. In *Safford*, the purpose of the search was to prevent a student from distributing medications to other students. 557 U.S. at 368. The purpose of Ms. Woodard's search was to check for reported child abuse. Although, as the dissent notes, all three searches served "the state's interest in child welfare," Dissent Op. at 6, the purpose of Ms. Woodard's search was different in kind from the others—to protect a child from reported abuse.

In *Dubbs*, the nature of the search was an intrusive examination of the genitals of all children in the class, "separated only by partitions, so that it was possible for other children to see or hear portions of the examinations performed on their classmates." *Dubbs*, 336 F.3d at 1199. "The girls were asked to lay spread-legged on a table where the nurses inspected the girls' labia; in some cases the nurses would 'palpate,' or touch, the genital area when a visual inspection was not adequate. Similarly, the nurses would palpate the

---

[22] The dissent, quoting *Dubbs*, states that "'[t]he focus of the [Fourth] Amendment is . . . on the security of the person, not the identity of the searcher or the purpose of the search.'" Dissent Op. at 7 (quoting *Dubbs*, 336 F.3d at 1206). But this quotation from *Dubbs* addressed whether the physical examinations in that case were "searches" under the Fourth Amendment in the first place, not whether a given search was reasonable under the Fourth Amendment.

boys' genitals to test for the presence of testes." *Id.* at 1200. Accordingly, not only was the state justification weaker in *Dubbs* than in this case, the search was far more invasive, far less private, and applied indiscriminately to the entire class. *Dubbs* held the search unconstitutional under "the 'special needs' balancing test," *id.* at 1214, but the factors to balance in this case are plainly different.

In *Safford*, school officers searched a student suspected of distributing medications to other students. 557 U.S. at 368. The search, which involved removal of the student's clothing and pulling aside her undergarments to expose private areas, *id.* at 369, was comparable to this case, but the circumstances underlying the search were different. The student searched in *Safford* was suspected of harming others through drug distribution. *Id.* at 377. The child in this case was suspected of suffering abuse from a third party. The *Safford* Court asked whether the search was "'reasonably related in scope to the circumstances which justified the interference,'" *id.* at 375 (quoting *T.L.O.*, 469 U.S. at 341), and held that it was not, given that the school lacked facts that the alleged medications were dangerous or that the student hid them "in her underwear." *Id.* at 376. Neither *Safford* or *Dubbs* served to clearly establish that Ms. Woodard's search of I.B. was not reasonably related in scope to the circumstances—suspected child abuse. The dissent correctly states that the searches in all three cases involved the children's "intimate areas," but the purpose and circumstances of the search for suspected child abuse in this case

31

differed too much for *Dubbs* and *Safford* to have guided Ms. Woodard with clearly established law.

Unlike the dissent, therefore, we do not see how a reasonable social worker in Ms. Woodard's position would, based on these cases, know that her search of I.B. violated the requirements for the special needs exception or the basic protections of the Fourth Amendment. "The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Wesby*, 138 S. Ct. at 590; *see also Mullenix*, 136 S. Ct. at 308 ("A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right.") (quotations omitted). As we have shown, the facts in this case differ markedly from the facts in the cases the dissent attempts to use for clearly established law.

Second, the dissent's reliance on these cases runs counter to the Supreme Court's repeated instruction that "clearly established law should not be defined at a high level of generality" but "must be particularized to the facts of the case." *White*, 137 S. Ct. at 552 (quotations omitted). The Court has stressed that the rule's high "degree of specificity" is "especially important in the Fourth Amendment context." *Mullenix*, 136 S. Ct. at 309. The dissent contends that the clearly established "particular rule" in December 2014, Dissent Op. at 6 (quoting *Wesby*, 138 S. Ct. at 590), was that a search "needed to be 'justified at its inception and reasonably related in scope to the circumstances that justified the interference

32

in the first place,'" *id.* (quoting Aplt. Br. at 36).  But this minimal Fourth Amendment

standard applies to all searches.  It is not particularized to the facts of this case.  The dissent

therefore attempts "to define clearly established law at a high degree of generality"

contrary to the Supreme Court's instructions.  *Kisela v. Hughes*, 138 S. Ct. 1148, 1152

(2018) (quotations omitted).[23]

Even if *Dubbs* and *Safford* offer plausible authority to support a special needs

Fourth Amendment violation here, whether they supply clearly established law is at most

debatable, and to be clearly established, "'existing precedent must have placed the statutory

or constitutional question beyond debate.'"  *White*, 137 S. Ct. at 551  (quoting *Mullenix*,

136 S. Ct. at 308).  "It is not enough that the rule is suggested by then-existing precedent."

*Wesby*, 138 S. Ct. at 590.  Qualified immunity lies where "none of the cases [the parties

---

[23] The Supreme Court has repeatedly emphasized for more than 35 years that generalized propositions of law are insufficient for clearly established law purposes. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (Court of Appeals "misapplied [qualified immunity] principles" when its "discussion of qualified immunity consisted of little more than an assertion that a general right Anderson was alleged to have violated— the right to be free from warrantless searches of one's home unless the searching officers have probable cause and there are exigent circumstances—was clearly established."); *Brosseau v. Haugen*, 543 U.S. 194, 198-99 (2004) (per curiam) (Court of Appeals was mistaken in using "the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness" for clearly established purposes because the proposition is "cast a high level of generality" (quotations omitted)).

and the dissent rely on] *squarely governs* the case here."  *Mullenix*, 136 S. Ct. at 309

(brackets and quotations omitted).[24]

To the extent the Does attempt to argue that this is the rare alleged violation of

minimal Fourth Amendment standards that is so "obvious" that a factually similar case

is unnecessary for the clearly established law standard,[25] *see* Aplt. Reply Br. at 6

(citing *Hope*, 536 U.S. at 741), this argument fails.  "[T]his is not an obvious case

where a body of relevant case law is not needed."  *Wesby*, 138 S. Ct. at 591 (quotations

omitted).

---

[24] The dissent also contends that *Safford* clearly establishes that "the categorically extreme intrusiveness" of a body search "requires some justification in suspected facts, general background possibilities fall short."  Dissent Op. at 7 (quoting *Safford*, 575 U.S. at 376).  But the Does and the dissent do not show that under the circumstances *in this case*, a reasonable social worker in Ms. Woodard's shoes would have known her conduct fell short.  As alleged in the First Amended Complaint, the report that I.B. was being abused contained specifics—"little bumps on I.B.'s face, a bruise about the size of a nickel on her neck, a small red mark on her lower back, two small cuts on her stomach, and bruised knees."  Aplt. App., Vol I at 15 ¶ 36.  Combined with a report of child abuse, a reasonable social worker could understand these to be "suspected facts," not "general background possibilities."  To the extent Appellants pled, as the dissent suggests, that "Ms. Woodard was never aware of facts that could have justified such an intrusive search of a four-year-old girl," Dissent Op. at 9, such an allegation is both conclusory and contradicted by other allegations in the First Amended Complaint.

[25] *See, e.g.*, *McCoy v. Meyers*, 887 F.3d 1034, 1053 (10th Cir. 2018) ("Even assuming that our previous cases were not sufficiently particularized to satisfy the ordinary clearly established law standard, ours is 'the rare obvious case, where the unlawfulness of the [state actor's] conduct is sufficiently clear even though existing precedent does not address similar circumstances.'" (quoting *Wesby*, 138 S. Ct. at 590); *see also White*, 137 S. Ct. at 552; *Brosseau*, 543 U.S. at 199.

*   *   *   *

In summary, the Does have not shown that Ms. Woodard's search violated clearly established Fourth Amendment law. We affirm the district court's conclusion that the Defendants, including supervisors, were entitled to qualified immunity and that the Fourth Amendment claims should be dismissed. [26]

## B. *Fourteenth Amendment Claims*

This section addresses the two substantive due process claims for violation of parental rights and interference with familial association. We describe our standard of review and provide legal background on the facts required to allege these types of claims and how those facts must "shock the conscience." We then examine whether the Does' complaint states a plausible claim under these standards and, like the district court, find it lacking.

### 1. **Standard of Review**

We review de novo a district court's Rule 12(b)(6) dismissal of a complaint for failure to state a claim. *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir.

---

[26] In a different circuit with more developed law, the analysis of the "clearly established" prong of qualified immunity might have been different. As noted above, we do not address the first step of qualified immunity analysis—whether the Defendants violated the Fourth Amendment.

We note that El Paso County DHS later instituted a policy under which social workers must ask parental permission or obtain a court order before searching and photographing children for suspected abuse. Aplt. App., Vol. II at 7.

2002).  To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead

sufficient factual allegations "to state a claim to relief that is plausible on its face."

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible

"when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009).  Dismissal under Rule 12(b)(6) is appropriate if the

complaint alone is legally insufficient to state a claim.  *See Peterson v. Grisham*, 594

F.3d 723, 727 (10th Cir. 2010).

Under our de novo review, "[a]ll well-pleaded facts, as distinguished from

conclusory allegations, must be taken as true," and we must liberally construe the

pleadings and make all reasonable inferences in favor of the non-moving party.  *Ruiz v.

McDonnell*, 299 F.3d 1173, 1181 (10th Cir. 2002) (quotations omitted).

2.  **Legal Background**

The following describes the parental right to direct medical care and the right of

familial association.  To state a claim for either, the plaintiff must show that the alleged

conduct "shocks the conscience."

a.  *Substantive due process claims—"shocks the conscience"*

In *Halley v. Huckaby*, 902 F.3d 1136 (10th Cir. 2018), we recently recounted

that the Supreme Court recognizes two types of substantive due process claims:  (1)

claims that the government has infringed a "fundamental" right, *see, e.g.*, *Washington*

*v. Glucksberg*, 521 U.S. 702, 721-22 (1997) (assessing asserted right to assisted suicide); and (2) claims that government action deprived a person of life, liberty, or property in a manner so arbitrary it shocks the judicial conscience, *see, e.g.*, *City of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (examining a high-speed police chase). *Halley*, 902 F.3d at 1153. "[W]e apply the fundamental-rights approach when the plaintiff challenges *legislative action*, and the shocks-the-conscience approach when the plaintiff seeks relief for tortious *executive action*." *Id.* The Does' substantive due process claims—violation of the parental right to direct medical care and to familial association—challenge executive action, *id.* at 1154, and therefore are "shocks the conscience" claims.

Executive action that shocks the conscience requires much more than negligence. *Moore v. Guthrie*, 438 F.3d 1036, 1040 (10th Cir. 2006). Even the actions of a reckless official or one bent on injuring a person do not necessarily shock the conscience. *Id.* "Conduct that shocks the judicial conscience" is "deliberate government action that is arbitrary and unrestrained by the established principles of private right and distributive justice." *Hernandez v. Ridley*, 734 F.3d 1254, 1261 (10th Cir. 2013) (quotations omitted). "To show a defendant's conduct is conscience shocking, a plaintiff must prove a government actor arbitrarily abused his authority or employed it as an instrument of oppression." *Id.* (brackets omitted) (quotations omitted). "The behavior complained of must be egregious and outrageous." *Id.*; *see*

37

*Breithaupt v. Abram*, 352 U.S. 432, 435 (1957) ("We set aside the conviction because such conduct 'shocked the conscience' and was so 'brutal' and 'offensive' that it did not comport with traditional ideas of fair play and decency.")  The Supreme Court found conscience-shocking behavior in a case involving a sheriff's application of stomach pumping to force vomiting, *Rochin v. California*, 342 U.S. 165, 172 (1952). This Circuit recently found a social worker's various actions that led to physical and sexual abuse of a minor shocked the conscience.  *T.D. v. Patton*, 868 F.3d 1209, 1213 (10th Cir. 2017).

   b.  *Parental right to direct child's medical care*

   The Fourteenth Amendment protects the right of parents to make decisions "concerning the care, custody, and control of their children."  *Troxel v. Granville*, 530 U.S. 57, 66 (2000).  This right provides "some level of protection for parents' decisions regarding their children's medical care."  *PJ ex rel Jensen v. Wagner*, 603 F.3d 1182, 1197 (10th Cir. 2010).  The right to direct a child's medical care is not absolute. "[W]hen a child's life or health is endangered by her parents' decisions, in some circumstances a state may intervene without violating the parents' constitutional rights."  *Id.* at 1198.  As noted above, a violation of this right must be conscience shocking.

c. *Right of familial association*

The government's "forced separation of parent from child, even for a short time, represents a serious impingement" on a parent's substantive due process right to familial association. *Jensen*, 603 F.3d at 1199 (quotations omitted). A familial association claim must be based on allegations of abusive government authority. *See Griffin v. Strong*, 983 F.2d 1544, 1547 (10th Cir. 1993); *see also Jensen*, 603 F.3d at 1198-99; *J.B. v. Washington County*, 127 F.3d 919, 927 (10th Cir. 1997). A parent must allege "*intent* to interfere" with this right—that is, the state actor must have directed conduct at the familial relationship "with knowledge that the statements or conduct will adversely affect that relationship." *Lowery v. City of Riley*, 522 F.3d 1086, 1092 (10th Cir. 2008). Again, the right is not absolute, but must be weighed against the state's interest in protecting a child's health and safety. *See Youngberg v. Romeo*, 457 U.S. 307, 320-21 (1982); *see also Jensen*, 603 F.3d at 1199; *Lowery*, 522 F.3d at 1092. In conducting this balancing, courts consider the severity of the infringement on the protected relationship, the need for defendants' conduct, and possible alternative courses of action. *See Griffin*, 983 F.2d at 1548.[27]

---

[27] In *Halley*, we explained that, the two-part test "simply describes the kind of behavior we find to shock the conscience in this context." 902 F.3d at 1154. "Namely, it shocks the conscience when: (1) the officials intended to deprive the plaintiff of a protected relationship with a family member, and (2) the officials' intrusion into the relationship was not warranted by state interests in the health and safety of the family member. Together, the facts alleged by the plaintiff on these points must meet the shocks-the-conscience standard." *Id.* (footnote and citation omitted).

To state a claim, Ms. Doe must have alleged that (1) the Defendants intended to deprive her of her protected relationship with her daughter, *see Estate of B.I.C. v. Gillen*, 710 F.3d 1168, 1175 (10th Cir. 2013); and that (2) the Defendants either unduly burdened Ms. Doe's protected relationship, *see Jensen*, 603 F.3d at 1199, or effected an "unwarranted intrusion" into that relationship, *Trujillo v. Bd. of Cty. Comm'rs*, 768 F.2d 1186, 1190 (10th Cir. 1985).

3. **Analysis**

a. *Right to direct medical care*

Ms. Doe's allegations on the right to control medical treatment do not "shock the conscience." To be conscience-shocking, Ms. Woodard's (or her supervisors') behavior had to be so "arbitrary" to be "as an instrument of oppression," "egregious," "outrageous," and "so brutal and offensive" that it runs afoul of "traditional ideas of fair play and decency." *Hernandez*, 734 F.3d at 1261; *Breithaupt*, 352 U.S. at 435.

The allegations did not allege this level of severity. They did not allege interference with Ms. Doe's control of I.B.'s medical treatment other than Ms. Woodard's performing an initial examination to determine whether I.B. had been abused. To the extent this was a "medical decision," it hardly rose to the level of what precedent requires for "shocks the conscience."

40

b. *Familial association*

Ms. Doe's familial association allegations similarly did not "shock the conscience" under *Halley.* We consider whether the complaint alleged (1) a deprivation of Ms. Doe's protected relationship with I.B. that (2) "unduly burdened" that relationship in a manner that was "egregious," "outrageous," "unrestrained," "brutal," and a display of arbitrary power being used "as an instrument of oppression." *Moore*, 438 F.3d at 1040; *Hernandez*, 734 F.3d at 1261; *Breithaupt*, 352 U.S. at 435.

Again, the complaint did not allege this level of severity. The Does argue in their brief that their complaint should be read to allege that Ms. Woodard intended to separate I.B. from her mother to conduct an examination without the mother present. But even if the complaint could be read this way, it still needed to allege an intended deprivation or suspension of the parent-child relationship that shocks the conscience. *See, e.g.*, *Thomas v. Kaven*, 765 F.3d 1183, 1195-96 (10th Cir. 2014) (complaint sufficiently stated claim for § 1983 familial association claim where it was alleged Defendant, upon suspecting domestic sexual abuse, placed a medical hold on a child to prevent parents from taking the child home from the hospital). Here, the complaint lacked allegations that Ms. Woodard's motivation was anything other than to investigate potential child abuse.

Moreover, the search happened during school hours when I.B.'s mother would not otherwise have been with her. To the extent I.B. was separated from her mother

41

during a time when she would have wanted her mother to be present, this is a far cry from the substantial separation required in other cases. *See, e.g.*, *Thomas*, 765 F.3d at 1188-90, 1197-98 (Fourteenth Amendment claim stated where plaintiff's daughter allegedly separated coercively for weeks in mental health ward); *Roska*, 328 F.3d at 1238-39, 1246 (familial association Fourteenth Amendment claim stated where child was removed from home and placed under protective care for a week).

\* \* \* \*

In summary, the Does have failed to state a Fourteenth Amendment substantive due process claim for violation of parental rights or interference with familial association against the Defendants.

## III.  CONCLUSION

We affirm the district court's (1) dismissal of the I.B.'s Fourth Amendment claims under qualified immunity, and (2) dismissal of the Does' Fourteenth Amendment claims for failure to state a claim.[28]

---

[28] We also affirm the district court's denial of the Does' motion for leave to amend their complaint.  Amendment would have been futile given this opinion's analysis of clearly established law.  *See Jefferson Cty. Sch. Dist. No. R-1 v. Moody's Inv'rs Servs., Inc.*, 175 F.3d 848, 859 (10th Cir. 1999) ("Although [Federal Rule of Civil Procedure] 15(a) provides that leave to amend shall be given freely, the district court may deny leave to amend where amendment would be futile.").

No. 18-1066, *Doe v. Woodard*
**BRISCOE**, Circuit Judge, concurring in part, dissenting in part.

I agree with the majority that it is not clearly established that a social worker investigating an allegation of child abuse must obtain a warrant before searching a child. But, as the majority acknowledges, uncertainty about whether Ms. Woodard was required to obtain a warrant does not fully dispose of I.B.'s Fourth Amendment claim. Maj. Op. at 26. "[T]he Does could still attempt to show that Ms. Woodard's search failed to meet clearly established minimal Fourth Amendment reasonableness standards applicable to special needs searches." *Id.* The majority concludes that the Does have not made this showing because the law is not clearly established; in the majority's view, the cases applying the special needs exception to a search of the intimate areas of a child's body are too factually dissimilar from Ms. Woodard's search of I.B. *Id.* at 28.

I disagree. Even assuming the special needs exception applied, it was clearly established in December 2014 that Ms. Woodard's search of I.B.'s intimate areas—a search that Ms. Woodard conducted without parental consent or a specific suspicion that evidence of abuse would be found—was unconstitutional. Any reasonable person would have known, based on *Dubbs v. Head Start, Inc.*, 336 F.3d 1194 (10th Cir. 2003), *cert. denied*, 540 U.S. 1179 (2004), and *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364 (2009), that Ms. Woodard's search violated the Fourth Amendment. Accordingly, I would reverse the district court's dismissal of the Does' Fourth Amendment claims against April Woodard, Christina Newbill, Shirley Rhodus, and Richard Bengtsson in their individual capacities, and remand for further proceedings. I would also reverse the

district court's denial of the Does' motion for leave to file a Second Amended Complaint. For these reasons, I respectfully dissent.[1]

## I

Ms. Woodard is entitled to qualified immunity "under § 1983 unless (1) [she] violated a federal statutory or constitutional right, and (2) the unlawfulness of [her] conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). I first address the "clearly established" prong. *McCoy v. Meyers*, 887 F.3d 1034, 1045 (10th Cir. 2018) ("Courts have discretion to decide the order in which to engage the two qualified immunity prongs." (alterations omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)). "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *Wesby*, 138 S. Ct. at 589. Two controlling cases decided before December 2014—*Dubbs*, 336 F.3d 1194, and *Safford*, 557 U.S. 364— apply the special needs exception to a search of the intimate areas of a child's body. "Clearly established law 'must [also] be particularized to the facts of the case.'" *McCoy*, 887 F.3d at 1044 (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam)). I therefore discuss the facts of *Dubbs* and *Safford* in detail.

In *Dubbs*, a group of parents sued a Head Start program for violating their toddlers' Fourth Amendment rights by conducting medical exams on the toddlers without parental consent. 336 F.3d at 1199–1200. "The children were required to lower or

---

[1] I agree with the majority's conclusions regarding the Does' Fourteenth Amendment claims.

remove their underclothes and were given a medical examination that included, among other things, a genital exam and blood test." *Id.* at 1200. The district court granted summary judgment to the Head Start program because it found that the searches were reasonable under the special needs exception. *Id.* at 1201. The special need asserted was "that the physical examination of a child, done in order to comply with federal regulations, is an effective means of identifying physical and developmental impediments in children prior to them starting school."[2] *Id.* at 1214 (quotation marks omitted). Without "resolv[ing] whether the 'special needs' doctrine applie[d]," we reversed "because it [was] plain that, if performed without the necessary consent, the searches were unconstitutional even [under] the 'special needs' balancing test." *Id.* at 1214.

We explained that, "[i]n special needs cases, . . . the warrant and probable cause requirement [is replaced] with a balancing test that looks to the nature of the privacy interest, the character of the intrusion, and the nature and immediacy of the government's interest."[3] *Id.* at 1213. We also emphasized that "[t]he premise of the 'special needs' doctrine is that . . . compliance with ordinary Fourth Amendment requirements would be 'impracticable.'" *Id.* at 1214 (quoting *Bd. of Educ. v. Earls*, 536 U.S. 822, 829 (2002)). The searches conducted by the Head Start program were plainly unconstitutional because

---

[2] We concluded that there was a genuine issue of fact about whether the "discovery of child abuse was one purpose of the exams." *Dubbs*, 336 F.3d at 1205.

[3] *Dubbs* was decided prior to *Safford*, so the special needs test is articulated slightly differently in each case.

3

"[t]here [was] no reason[] . . . to think that parental notice and consent [was] 'impracticable.'" *Id.* at 1215.

Lack of parental consent was a decisive fact in *Dubbs* because "the requirement . . . of parental consent in the case of minor children[] serves important practical as well as dignitary concerns, even when a social welfare agency . . . believes it is acting for the good of the child." *Id.* at 1207. "Even beyond constitutional values of privacy, dignity, and autonomy, parental notice and consent for childhood physical examinations are of significant practical value." *Id.* Parents can "provide medical histories, discuss potential issues with the health care professionals, help to explain the procedures to the children, and reassure them about the disturbing and unfamiliar aspects of the exam—which included . . . visual . . . inspection of genitals by strangers." *Id.*

Six years after *Dubbs*, the Supreme Court also analyzed the constitutionality of a search of a child's intimate areas under the special needs exception. *See Safford*, 557 U.S. 364. In *Safford*, a 13-year-old student was accused of distributing prescription and over-the-counter medications to other students at her school. *Id.* at 368. The pills had previously made another student sick. *Id.* at 372. In an effort to locate the medications, an assistant principal and administrative assistant searched the accused student's backpack, but found nothing. *Id.* The assistant principal then "instructed [the assistant] to take [the student] to the school nurse's office to search her clothes for pills." *Id.* at 369. They found no medications. *Id.* Having already removed all of her clothing except her underwear, the student "was told to pull her bra out and to the side and shake it, and to pull out the elastic on her underpants, thus exposing her breasts and pelvic area to

4

some degree." *Id.* Again, "[n]o pills were found." *Id.* The student's mother sued the assistant principal for violating her daughter's Fourth Amendment rights. *Id.*

The Court explained that this type of search "implicate[s] the rule of reasonableness as stated in [*New Jersey v. T.L.O.*, 469 U.S. 325 (1985)], that 'the search as actually conducted [be] reasonably related in scope to the circumstances which justified the interference in the first place.'" *Id.* at 375 (second alteration in original) (quoting *T.L.O.*, 469 U.S. at 341). Under this special needs test, "[t]he scope [of the search] will be permissible[] . . . when it is 'not excessively intrusive in light of the age and sex of the [child] and the nature of the'" government's interest in conducting the search. *Id.* (quoting *T.L.O.*, 469 U.S. at 342).

The Court emphasized the severity of a search that "expos[es]" a child's "intimate parts." *Id.* at 377. "[B]oth subjective and reasonable societal expectations of personal privacy support the treatment of . . . a search [of a child's intimate areas] as categorically distinct" from more limited searches of her "outer clothing and belongings." *Id.* at 374. "The meaning of such a search, and the degradation its subject may reasonably feel, place a search that intrusive in a category of its own demanding its own specific suspicions." *Id.* at 377. "[G]eneral background possibilities fall short; a reasonable search [so] extensive calls for suspicion that it will pay off." *Id.* at 376. Ultimately, the Court held that the assistant principal's search was unconstitutional because he did not possess facts suggesting either that the alleged medications posed any "danger to the students" or that the student was hiding medications "in her underwear." *Id.* at 376–77.

The legal principle controlling the constitutionality of Ms. Woodard's search of I.B. is clearly established because *Dubbs* and *Safford* are "particularized to the facts of [this] case." *McCoy*, 887 F.3d at 1044 (quoting *Pauly*, 137 S. Ct. at 552). Both cases analyze the search of the intimate areas of a child's body under the special needs exception, which is the issue presented here. In both cases, the searches were justified by the state's interest in child welfare—"identifying physical and developmental impediments" in *Dubbs*, 336 F.3d at 1214, and preventing students from distributing medications in *Safford*. Both searches were conducted by multiple adults, on school property, without parental notification, consent, or presence. In both *Dubbs* and *Safford*, the searches violated the Fourth Amendment.

This "precedent [is] clear enough that every reasonable official would interpret it to establish the particular rule the [Does] seek[] to apply," *Wesby*, 138 S. Ct. at 590, namely that Ms. Woodard's search needed to be "justified at its inception and reasonably related in scope to the circumstances that justified the interference in the first place," Aplt. Br. at 36 (citing *Safford*, 557 U.S. at 375). *See Jones v. Hunt*, 410 F.3d 1221, 1228–31 (10th Cir. 2005) (reversing grant of qualified immunity to a social worker who seized a student on school property because the seizure was not "justified at its inception"). Given their factual similarities to the search at issue here, *Dubbs* and *Safford* "obviously resolve whether the circumstances . . . confronted" by Ms. Woodard satisfied the special needs exception. *Wesby*, 138 S. Ct. at 590 (quotation marks omitted).

The majority concludes that the searches at issue in *Dubbs* and *Safford* are too dissimilar from Ms. Woodard's search of I.B. for *Dubbs* and *Safford* to be clearly

6

established law.  Maj. Op. at 28–32.  I do not think that Defendants are entitled to qualified immunity based on the factual differences between *Dubbs*, *Safford*, and Woodard's search of I.B.  "[T]here does not have to be 'a case directly on point[;]' existing precedent must [have] place[d] the lawfulness of the particular [action] 'beyond debate.'"  *Wesby*, 138 S. Ct. at 590 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  At the very least, *Safford* clearly established the legal principle that, under the special needs exception, a government official's search of a child's body must be "reasonably related in scope to the circumstances which justified the interference in the first place."  557 U.S. at 375 (quoting *T.L.O.*, 469 U.S. at 341).  *Safford* also established that, because of "the categorically extreme intrusiveness of a search down to the body," such a search "requires some justification in suspected facts, general background possibilities fall short."  *Id.* at 376.  To be "reasonable," a "search that extensive calls for suspicion that it will pay off."  *Id.*

Ms. Woodard could not have thought herself exempt from *Safford*.  "We have held that the Fourth Amendment subjects state social workers to its requirements," *Jones*, 410 F.3d at 1225, because "[t]here is no 'social worker' exception to the Fourth Amendment," *Dubbs*, 336 F.3d at 1205.  Neither does the fact that Ms. Woodard was investigating an allegation of child abuse meaningfully set her apart from a school administrator investigating the distribution of medications on campus.  *See Dubbs*, 336 F.3d at 1206 ("The focus of the [Fourth] Amendment is . . . on the security of the person, not the identity of the searcher or the purpose of the search."); *Franz v. Lytle*, 997 F.2d 784, 793 (10th Cir. 1993) (A police officer's "motive to protect [a] child [from abuse] does not

7

vitiate [the child's] Fourth Amendment rights."). While the effective investigation of child abuse is "a strong government interest," *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1242 (10th Cir. 2003), that does not relieve a social worker of her obligation to justify the search of a child's intimate areas with "facts," not "general possibilities," *Safford*, 557 U.S. at 376.[4]

As I discuss in the next section, this is where Ms. Woodard fell short of meeting the standard required by clearly established law. The Does have pled an unconstitutional search under *Safford* because they have alleged that Ms. Woodard was not aware of specific facts to justify a reasonable suspicion that she would find evidence of abuse by examining I.B.'s intimate areas. *See McCoy*, 887 F.3d at 1052–53 (concluding that precedent was clearly established law even though "not factually identical" to the case on appeal because the precedent was "factually analogous" and "share[d] . . . decisive factual circumstance[s]" with the case on appeal).

## II

Because I would conclude that there is clearly established law on the question of whether Ms. Woodard's search was constitutional under the special needs exception, I would also address the remaining prong of the qualified immunity test—whether Ms. Woodard "violated [I.B.'s] federal . . . constitutional right." *Wesby*, 138 S. Ct. at 589.

---

[4] "[W]e must be sensitive to the fact that society's interest in the protection of children is, indeed, multifaceted, composed not only with concerns about the safety and welfare of children from the community's point of view, but also with the child's psychological well-being, autonomy, and relationship to the family or caretaker setting." *Franz*, 997 F.2d at 792–93.

Ms. Woodard's search needed to be "reasonably related in scope to the circumstances which justified the interference in the first place," meaning that the search should "not [have been] excessively intrusive in light of the age and sex of [I.B.] and the nature of the" government interest. *Safford*, 557 U.S. at 375 (quoting *T.L.O.*, 469 U.S. at 341, 342). Certainly, the government's interest in thoroughly and promptly investigating allegations of child abuse is weighty. *See Roska*, 328 F.3d at 1242 ("It is true that the state has a strong interest in protecting children, and that this interest should be taken into account in evaluating the reasonableness of [a] search . . . ."). But that interest does not supersede I.B.'s Fourth Amendment right to be free from unreasonable search. *See id.* According to the operative First Amended Complaint, Ms. Woodard was never aware of facts that could have justified such an intrusive search of a four-year-old girl, even under the special needs exception. *See Jones*, 410 F.3d at 1223 ("When reviewing a dismissal pursuant to Rule 12(b)(6), we accept the well-pleaded allegations of the complaint as true and view them in the light most favorable to the plaintiff."). Because this analysis is fact-intensive, I recount and expand upon the facts discussed by the majority.

The El Paso County Department of Human Services "received a report that I.B. was being abused" on December 9, 2014. App. Vol. I at 15. "Allegations of abuse included little bumps on I.B.'s face, a bruise about the size of a nickel on her neck, a small red mark on her lower back, two small cuts on her stomach, and bruised knees." *Id.* The next day, on December 10, 2014, Ms. Woodard went to I.B.'s school. *Id.* at 16. At that time, Ms. Woodard had already "received permission from her supervisor[] . . . to

9

view I.B.'s buttocks, stomach/abdomen, and back so [she] could look for marks/bruises." *Id.* (quotation marks omitted).

I.B was taken to the school nurse's office with Ms. Woodard and a school health paraprofessional. *Id.* Without first assessing the accuracy of the report of abuse—which, given the location of the alleged injuries, could have been accomplished without fully removing I.B.'s clothes—"Ms. Woodard instructed I.B. to show her buttocks and stomach and back." *Id.* Ms. Woodard and the school health employee then "took off all I.B.'s clothes" and "viewed I.B." *Id.* When Ms. Woodard later documented her findings, she noted that "the marks observed were not consistent with the" report of alleged abuse. *Id.* at 17.

Nevertheless, Ms. Woodard and the school nurse "prepared to take photographs." *Id.* at 16. "I.B. told Ms. Woodard she did not want photographs taken." *Id.* Undeterred, Ms. Woodard "took color photographs of private and unclothed areas of I.B.'s body." *Id.* At no point did Ms. Woodard notify Ms. Doe of her plan to search I.B. or seek consent from Ms. Doe to conduct the search. *See id.* at 17.

The next day, on December 11, 2014, Ms. Woodard visited the Does' home to continue her investigation. *Id.* at 16. On January 5, 2015, "[t]he case was closed as unfounded." *Id.* at 17.

*Safford* dictates the outcome of this case. The privacy intrusion at issue here is more serious than in *Safford*, where the student's "breasts and pelvic area" were briefly exposed "to some degree," 557 U.S. at 374, because Ms. Woodard removed all of I.B.'s clothes and took color photographs of I.B.'s naked body. To survive Fourth Amendment

10

scrutiny, even under the special needs exception, Ms. Woodard's search would have required "specific suspicions" that I.B was in "danger" or that there was "evidence of wrongdoing" in the private areas of I.B.'s body. *Id.* at 377. As alleged, Ms. Woodard had neither.

The Does' allegations do not support an inference that Ms. Woodard believed I.B. to be in particular danger. *See id.* at 375–76 ("[T]he content of the [vice principal's] suspicion failed to match the degree of intrusion" because "[h]e must have been aware of the nature and limited threat of the specific drugs he was searching for[.]"). DHS did not dispatch Ms. Woodard to investigate the allegation of abuse until the day after its receipt, when I.B. was already back at school. It is reasonable to infer that, had DHS or Ms. Woodard considered I.B. to be in particular danger, Ms. Woodard would have intervened more promptly. Nor is there any indication that, when Ms. Woodard arrived at the school, I.B. appeared more injured or more in danger than the report suggested.

Neither could Ms. Woodard have had a "specific suspicion[]" that evidence of abuse would be found in the private areas of I.B.'s body. *Id.* at 377. No facts were pled that support such a suspicion. The report of abuse was limited to I.B.'s neck, back, stomach, and knees—all non-private, or at least less private, areas of I.B.'s body. Nothing more than a "general background possibilit[y]" could have supported Ms. Woodard's apparent belief that she would find evidence of abuse by fully undressing I.B. *Id.* at 376. But as the Supreme Court has held, such general possibilities "fall short" when "the categorically extreme intrusiveness of a search down to the body of a" child is at issue. *Id.* Even if Ms. Woodard had initially limited her search to the areas of I.B.'s

11

body implicated by the report of abuse—which Ms. Woodard did not do—she would have learned no facts to support expanding the search; "the marks observed were not consistent with the" report of abuse. App. Vol. I at 17. Therefore, based on *Safford*, Ms. Woodard's search was unconstitutional under the special needs exception to the Fourth Amendment.

I would reach the same conclusion relying on *Dubbs*. Ms. Woodard's search was unreasonable because she had "no justification for proceeding without parental notice and consent." *Dubbs*, 336 F.3d at 1214. Ms. Woodard began to investigate the allegation of abuse the day after the report was received by DHS, ostensibly giving Ms. Woodard time to speak with Jane Doe, I.B.'s mother. App. Vol. I at 15–16. In fact, Ms. Woodard had time to secure her supervisor's approval for the search prior to arriving at I.B.'s school, *id.* at 16, making it all the more reasonable to infer that Ms. Woodard had time to seek consent from Ms. Doe. Instead, Ms. Woodard elected to search I.B. without Ms. Doe's consent, which left four-year-old I.B. alone in the school nurse's office as two adult strangers examined and photographed her naked body in search of signs of physical abuse. Ms. Doe could not "discuss potential issues with" Ms. Woodard, "help to explain" the search to I.B., or "reassure [I.B.] about the disturbing and unfamiliar aspects of the exam." *Dubbs*, 336 F.3d at 1207. "[I]t is plain that" Ms. Woodard's search of I.B. was "unconstitutional." *Id.* at 1214.

The unconstitutional nature of Ms. Woodard's search becomes even clearer upon consideration of new facts alleged in the proposed Second Amended Complaint.[5]  First, the Does allege that Ms. Woodard was aware, before she searched I.B., of a previous unfounded report of abuse from I.B.'s school.  App. Vol. I at 206.  Ms. Woodard also "knew that Jane Doe had been cooperative in [the] previous DHS investigation."  *Id.*  Second, the Does allege that Ms. Woodard "interviewed I.B. at her school prior" to the search.  *Id.* at 230.  During this interview, "I.B. told [Ms.] Woodard that she gets red dots on her face when she cries, but that she did not have any other 'owies.'"  *Id.*

Because Ms. Woodard knew that I.B.'s school had previously made an unfounded report of abuse, it was less reasonable for Ms. Woodard to rely on a report from the same source to justify a search of the intimate areas of I.B.'s body.  That Ms. Woodard knew Ms. Doe had cooperated in the previous DHS investigation also made it less reasonable for Ms. Woodard to search I.B. without first attempting to notify Ms. Doe.  Finally, when I.B. explained the marks on her face and denied any other injuries, it was not reasonable for Ms. Woodard to then expand the search beyond the scope of reported abuse, to include I.B.'s entire body.  Ms. Woodard's "search[,] as actually conducted," needed to be "reasonably related in scope to the circumstances which justified the [search] in the first place."  *Safford*, 557 U.S. at 375.  The new facts alleged in the proposed Second

---

[5] Because the Does' motion for leave to amend was not futile, in that it would state a claim under the Fourth Amendment, I would also reverse the district court's denial of the motion to amend.  *See Miller ex rel. S.M. v. Bd. of Educ.*, 565 F.3d 1232, 1249 (10th Cir. 2009) ("[W]hen denial [of a motion to amend a pleading] is based on a determination that amendment would be futile, our review for abuse of discretion includes de novo review of the legal basis for the finding of futility.").

Amended Complaint make it all the more plain that Ms. Woodard's search was unconstitutional.

Because I would conclude that Ms. Woodard violated I.B.'s clearly established Fourth Amendment rights, "it [would] become[] [Defendants'] burden to prove that her conduct was nonetheless objectively reasonable." *Roska*, 328 F.3d at 1251. Defendants argue that Ms. Woodard's search was objectively reasonable because it was authorized by statute. "In considering the objective legal reasonableness of the state officer's actions, one relevant factor is whether the defendant relied on a state statute, regulation, or official policy that explicitly sanctioned the conduct in question." *Id.* (quotation marks omitted). "[A]n officer's reliance on an authorizing statute does not render the conduct per se reasonable," but "the existence of a statute or ordinance authorizing particular conduct is a factor which militates in favor of the conclusion that a reasonable official would find that conduct constitutional." *Id.* at 1252 (quotation marks omitted).

> [A] court must consider whether reliance on the statute rendered the [official's] conduct "objectively reasonable," considering such factors as: (1) the degree of specificity with which the statute authorized the conduct in question; (2) whether the officer in fact complied with the statute; (3) whether the statute has fallen into desuetude; and (4) whether the officer could have reasonably concluded that the statute was constitutional.

*Id.* at 1253 (footnotes omitted).

Defendant's rely on Colorado Revised Statute § 19-3-306(1), which states: "Any . . . social worker . . . who has before him a child he reasonably believes has been abused or neglected may take or cause to be taken color photographs of the areas of trauma

14

visible on the child." I do not think this statute renders Ms. Woodard's search reasonable.

First, the statute does not authorize Ms. Woodard to undress I.B. The statute specifically limits Ms. Woodard's authority to photograph "areas of trauma" that are "visible." *Id.* That implies some areas of trauma are not visible. Once a child is undressed, all external areas of trauma become visible. But the statute says nothing about what procedures a social worker must follow to undress a child.

Moreover, Ms. Woodard did not photograph areas of trauma. The Does allege that Woodard took photographs of "private and unclothed areas of I.B.'s body," App. Vol. I at 16, even though the report of abuse only implicated non-private parts of I.B.'s body and "the marks observed [on I.B.'s body] were not consistent" with the report of abuse, *id.* at 17.

Ms. Woodard also let I.B. return to school and her mother's custody, which further suggests that Ms. Woodard did not "reasonably believe[ I.B.] ha[d] been abused or neglected." Colo. Rev. Stat. § 19-3-306(1). Defendants have therefore not met their burden of showing that the state statute rendered Ms. Woodard's search objectively reasonable. *See Halley v. Huckaby*, 902 F.3d 1136, 1151–52 (10th Cir. 2018) (state statute authorizing interview of a suspected victim of child abuse "at any place" did not make it reasonable to think that "DHS [could] . . . take a child *into custody* anywhere and everywhere").

**III**

15

I concur in the majority's rulings on the Fourteenth Amendment claims and would AFFIRM on those claims. Because I would conclude the Does have alleged that Ms. Woodard violated I.B.'s clearly established Fourth Amendment rights, I would REVERSE in part and REMAND for further proceedings on the Does' Fourth Amendment claims, as alleged in the proposed Second Amended Complaint, against April Woodard, Christina Newbill, Shirley Rhodus, and Richard Bengtsson in their individual capacities.